Moises **DERECHIN**, Plaintiff,

v.

**STATE UNIVERSITY OF NEW YORK,** State University of New York at Buffalo, Steven Sample, as President, State University of New York at Buffalo, William Greiner, as Provost, State University of New York at Buffalo, John Naughton, as Dean of the School of Medicine, State University of New York at Buffalo, David Triggle, as Dean of the School of Pharmacy, State University of New York at Buffalo and Alexander C. Brownie, as Chairman of the Department of Biochemistry, State University of New York at Buffalo, Defendants.

No. CIV–89–641E.

United States District Court, W.D. New York.

Dec. 7, 1989.

Nicholas Sargent, Buffalo, N.Y., for plaintiff.

Allithea Lango, Asst. Atty. Gen., Buffalo, N.Y., for defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

This is an employment discrimination action brought under Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, under the Fourteenth Amendment to the federal constitution and under Article I, Section 6 of the constitution of the State of New York. The various defendants have moved to dismiss the Complaint, each asserting that it fails to state a meritorious claim for relief.[1] *See* Fed.R.Civ.P. rule 12(b)(6).

In evaluating these motions, this Court is of course obliged to accept the allegations of the Complaint as true and to draw all

---

**1.** Three separate dismissal motions were filed July 18, 1989. One on behalf of defendants State University of New York and State University of New York at Buffalo, another on behalf of defendants Steven Sample and William Greiner, and the last on behalf of defendants John Naughton, David Triggle and Alexander C. Brownie. Oral argument on these motions was heard August 14, 1989. At that time this Court expressed its displeasure with the fact that counsel for the defendants had not supplied a memorandum of legal authorities in support of the motions. She represented that she could supply one forthwith. A week later, however, such memorandum not having been filed or served upon the plaintiff, the latter's counsel dispatched a letter to this Court requesting that the matter be submitted for advisement in the absence of a defendants' memorandum. Letter from Robert V. Hefka, Esq. to this Court (dated August 21, 1989). The motions have accordingly been deemed submitted as the date of receipt of such letter, August 22, 1989.

reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Moreover, matters outside the Complaint itself cannot be considered. Fed.R.Civ.P. rule 12(b).

The plaintiff has been since 1964, and evidently remains, a member of the faculty in the biochemistry department of defendant State University of New York at Buffalo ("UB"). *See* Complaint, ¶¶ 12, 25, 109, 116. UB is one of four "university centers" created by the state legislature as part of defendant State University of New York ("SUNY"). *See* New York's Education Law § 352(3). Defendant Steven Sample is the president of UB. Complaint ¶ 7. Defendant William Greiner is its provost. *Id.,* ¶ 8. Defendants John Naughton and David Triggle are deans of UB's schools of medicine and pharmacy, respectively,—*id.,* ¶¶ 9–10—, and defendant Alexander C. Brownie is chairman of the biochemistry department there. *Id.,* ¶ 11.

The plaintiff is a native of Argentina [2]—Complaint, ¶ 107—and the only such person on the faculty of UB's biochemistry department. *Id.,* ¶ 109. Triggle and Brownie, by contrast, are British natives— *id.,* ¶ 110—and the other individual defendants presumably are American natives.[3] The plaintiff contends that he has and is continuing to be discriminated against in the terms and conditions of his employment because of his national origin. *Id.,* ¶ 117. He has received notice of the right to sue from the Equal Employment Opportunity Commission and alleges that all conditions precedent to the bringing of a Title VII action have been satisfied. *Id.,* ¶¶ 103, 105–106.

Chronologically, the *pertinent* factual allegations are these. The plaintiff received tenure at UB in 1970, becoming an associate professor of biochemistry. Complaint, ¶¶ 12, 14. In 1976 he was made project

director for a certain unspecified research project undertaken at UB pursuant to a grant from the National Institute of Health ("NIH"). *Id.,* ¶¶ 15, 81. At some point, however, without the plaintiff's prior awareness or consent, "a piece of equipment vital to the project was sent to England with the approval of defendant Naughton [and] under recommendation of defendant Brownie. Another piece of equipment essential to the project which was on loan to [the previous project director] was permitted to remain in England permanently, also on the recommendation of defendant Brownie." *Id.,* ¶¶ 17–18; *see also* ¶¶ 82–83. The plaintiff's implementation of the project was thus "adversely affected." *Id.,* ¶ 19.

Subsequently, in June 1979, the plaintiff made it known that he was intending to leave UB and to accept employment with a private medical center in New York City. Complaint, ¶ 21. The defendants offered him certain assurances to dissuade him from leaving—to wit, (1) that he would be accepted into the clinical pathology training program, (2) that he would be permitted to teach clinical biochemistry following his training and (3) that he would be supported in "reactivating" his research. *Id.,* ¶ 22. The plaintiff relied on such assurances in remaining at UB. *Ibid.* However, the plaintiff says that the defendants' promises were effectively breached when, in 1982, Brownie permanently cut off his access to laboratory and office space, making it impossible for him to perform research or to obtain research grants. *Id.,* ¶¶ 23–24, 26, 65–66, 68, 74, 85–86, 88. He has since then been the only one of some twenty faculty members in the biochemistry department without assigned office or laboratory space. *Id.,* ¶¶ 25, 67, 87, 116. Further, the plaintiff was not given the opportunity to teach clinical biochemistry. *Id.,* ¶¶ 28, 30.

In an effort to rectify matters, the plaintiff began a correspondence with Sample,

---

**2.** He became a naturalized United States citizen September 10, 1981. Complaint, ¶ 107. He had received his medical training at the University of Buenos Aires and later obtained a doctoral

degree in medicine from the University of London. *Id.,* ¶ 13.

**3.** The inference is drawn from the lack of an allegation as to their nationality.

and later with Greiner. Complaint, ¶¶ 31, 89. He wrote Sample October 19, 1982, explaining that he felt his NIH research project had been wrongfully obstructed and that he had had to relinquish office space. *Id.*, ¶ 32. Sample responded, by letter dated January 20, 1983, that the plaintiff should discuss the matter initially with Brownie and, if "displeased," with Naughton, then with UB's vice president, and finally (should matters remain unresolved) with him. *Id.*, ¶ 33.

After an unsuccessful meeting with Brownie, the plaintiff wrote Sample again June 20, 1983, " 'with a view towards resolving the matter in a substantive fashion' " once and for all. *Id.*, ¶ 34 (quoting from the letter). Sample replied October 11, 1983, reiterating the necessity for the plaintiff to continue processing his grievances through the appropriate channels, starting with Naughton. *Id.*, ¶ 35. The plaintiff responded to Sample November 4, 1984 that, having "dealt directly with defendants Brownie and Naughton for over seven years to no avail," he found Sample's proposed procedures futile. *Id.*, ¶ 36. The plaintiff wrote to Sample three more times, March 9th, 12th and 13th, 1984, indicating that the situation had " 'intensified' " and " 'serious[ly] escalat[ed]'," that his efforts to obtain employment elsewhere had been obstructed and that he was contemplating legal action. *Id.*, ¶¶ 37–39 (quoting from the respective letters). Sample dispatched a letter dated March 23, 1984 to the plaintiff advising that in light of the threat of litigation he was consulting with the university's attorney. *Id.*, ¶ 40. Sample later (August 20, 1984) wrote another letter instructing the plaintiff to "pursue his concerns" with Greiner. *Id.*, ¶ 41.

The plaintiff sent a letter to Greiner September 19, 1984 reporting his problems and "recommend[ing] * * * corrective action." Complaint, ¶¶ 42–43. He sent a follow-up letter to Greiner November 7, 1984. *Id.*, ¶ 44. In response, the plaintiff received a letter dated December 11, 1984 from UB associate provost Judith E. Albino advising that she was "confident that an appropriate resolution would be found." *Id.*, ¶ 45. Finally, the plaintiff received a letter from Greiner dated February 8, 1985. The provost suggested that the plaintiff deal with Naughton instead. *Id.*, ¶ 46. "[N]o corrective action was ever taken." *Id.*, ¶ 47.

The plaintiff was later removed from all teaching duties without prior notice or explanation—Complaint, ¶¶ 48–49, 70–71, 91–92—and he has not had a teaching assignment since 1985. *Id.*, ¶¶ 55, 72, 98. In conjunction with his inability to research, his incapacity to teach has deprived the plaintiff of "any means to develop or progress in [his] vocation"—*id.*, ¶ 62—or an opportunity to demonstrate recent experience to other potential employers. *Id.*, ¶¶ 61, 75–76, 99.

The plaintiff expressly asserts three causes of action. He says that he has been deprived of his right to liberty and property without due process of law and in violation of the Fourteenth Amendment and Article I, Section 6 of New York's constitution and says that he has been discriminated against on the basis of national origin in violation of Title VII.[4] Impliedly, a fourth cause of action, for violation of the Fourteenth Amendment's equal protection clause, is also asserted.[5] The plaintiff requests $1.5 million in damages, declaratory relief and an injunction against further misconduct.

In assessing the sufficiency of these allegations, a jurisdictional issue under the Eleventh Amendment should first be considered.[6] Two of the defendants, UB and

---

**4.** The Title VII claim is denoted as the Third Cause of Action, the state constitutional claim is contained in the First Cause of Action and, oddly, the federal due process claim is iterated twice, in both the First and Second Causes of Action.

**5.** No specific mention is made of the equal protection clause of the otherwise often referenced Fourteenth Amendment. Such cause of action, however, is implicit within the allegations of discrimination.

**6.** The Eleventh Amendment provides "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

SUNY, are state-created entities. *See* New York's Education Law § 352. Absent express consent or congressional action derogating state sovereign immunity, a suit against a state "or one of its agencies or departments" is jurisdictionally barred by the Eleventh Amendment. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100–102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *see Eng v. Coughlin,* 858 F.2d 889, 896 (2d Cir.1988). Each of the individual defendants is named in his official capacity in the Complaint's heading although having been charged with federal constitutional violations in their private capacities as well as in their offices. Complaint, ¶ 80. State officials may be sued, *as officials,* for injunctive relief for ongoing violations of federal law—*Papasan v. Allain,* 478 U.S. 265, 276–278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986); *see Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 453–454, 52 L.Ed. 714 (1908)—and, *as individuals,* for damages as well as injunctive relief for illegal conduct beyond their authority. *Papasan v. Allain, supra,* 478 U.S. at 278 fn. 11, 106 S.Ct. at 2940 fn. 11; *see Scheuer v. Rhodes, supra,* 416 U.S. at 237–238, 94 S.Ct. at 1687. They cannot, however, be sued in their official capacity for violations of state law. *Papasan v. Allain, supra,* 478 U.S. at 277, 106 S.Ct. at 2939; *Pennhurst State School & Hosp. v. Halderman, supra,* 465 U.S. at 104–106, 104 S.Ct. at 910–911.

In Title VII actions, "the threshold fact of congressional authorization * * * to sue the State as employer is clearly present," but only with regard to equitable relief. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976). Hence, the Title VII claim may proceed against all of the defendants but without an opportunity to garner legal damages.

■ The federal constitutional claims, however, are far more problematic. The enabling statute for such claims, 42 U.S.C. § 1983, was not intended by Congress to override state sovereign immunity. *Will v. Michigan Dept. of State Police,* —— U.S. ——, 109 S.Ct. 2304, 2310, 105 L.Ed.2d 45 (1989). A state is not a "person" within the meaning of section 1983 and is thus wholly incapable of lending its consent to suit thereunder. *Id.,* 109 S.Ct. at 2308–2311. Further, state officials acting in their official capacities are likewise not "persons" within the meaning of section 1983, except insofar as they are sued for prospective injunctive relief. *Id.,* at 2311 & fn. 10. Thus, declaratory and injunctive relief may be available for the federal due process and equal protection claims against the individual defendants, who have been sued in their official capacities, but these claims are otherwise deficient. The Fourteenth Amendment claims will be dismissed against UB and SUNY and the prayer for damages against the individual defendants in their official capacities will be stricken. Damages will remain available against the individual defendants as individuals.

■ The state constitutional claim is barred by sovereign immunity even as to prospective injunctive relief. *Pennhurst State School & Hosp. v. Halderman, supra,* 465 U.S. at 104–106, 117–121, 104 S.Ct. at 910–911, 917–919. It remains viable, however, as to the individual defendants in their individual capacities.

■ Turning to a consideration of the merits of the Title VII claim, this Court finds such to be adequately, if inartfully, stated. Title VII makes it unlawful for an employer to discriminate against an individual with respect to his terms, conditions and privileges of employment or to limit his employment opportunities because of his national origin. 42 U.S.C. § 2000e–2(a). A plaintiff's initial burden in Title VII actions is slight. He must merely establish a *prima facie* case of discrimination. The burden of going forward then shifts to his employer to articulate a non-discriminatory reason for its conduct, after which it reverts to the plaintiff to demonstrate that the proffered justification is merely pretextual. *McDonnell Douglas Corp. v. Green,*

411 U.S. 792, 801–804, 93 S.Ct. 1817, 1823–1825, 36 L.Ed.2d 668 (1973).

Here the plaintiff has alleged that he is the only Argentinean national in his department and likewise the only faculty member in his department without office space or laboratory facilities. An inference of invidious discrimination therefrom is justified. The plaintiff has thus alleged a *prima facie* case of discrimination in violation of Title VII.

■ Similarly, the plaintiff has adequately outlined an equal protection claim. Discrimination based upon nationality or alienage is "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). The plaintiff's *prima facie* case of discrimination because of his Argentinean origins thus fulfills the requisites of an equal protection claim against the offending state officials. Greiner and Sample are, according to the plaintiff's tenable thesis, personally implicated in any constitutional violations of the other individual defendants by having failed to remedy the ongoing wrong after having learned of such. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986).

■ Finally, the Fourteenth Amendment and state constitutional due process claims are also adequately stated.[7] Such claims depend for their vitality on the existence of a property interest in the terms and conditions and privileges of the plaintiff's employment. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). But a public employee may predicate his claim of entitlement to a property interest triggering constitutional safeguards on his employment agreement or other understanding with his employer, whether express or implied. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). The sufficiency of the promissory claim of entitlement depends, obviously, upon state law. *Ibid.; see Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (constitutional property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law").

Here, the plaintiff alleges that unspecified "defendants" had given assurances regarding his teaching and research opportunities upon which the plaintiff relied in remaining at UB. *See* Complaint, ¶ 22. Under the doctrine of promissory estoppel, as recognized in New York and applied to the plaintiff's allegations, such defendants would be estopped from disclaiming the legal effect of their clear and unambiguous assurances which were reasonably and foreseeably relied upon.[8] *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989); *Esquire Radio & Electronics v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir.1986); *see Restatement (Second) of Contracts*, § 90. Thus, in breaching such assurances (as is alleged), such defendants violated the plaintiff's due process rights.[9]

Accordingly, it is hereby ORDERED that the Fourteenth Amendment claims are dismissed as against the State University of New York and the State University of New York at Buffalo and the individual defendants in their official capacities except insofar as the latter are sued for prospective injunctive relief on the Fourteenth Amendment claims, that the prayer for monetary

---

**7.** The pertinent language of Article I, Section 6 of New York's constitution mirrors that of the Fourteenth Amendment's due process clause and for purposes of the instant motion is assumed to assure equivalent rights.

**8.** It may be that the plaintiff's employment contract had terms conflicting with the (presumably oral) assurances the plaintiff had received. But the Complaint says nothing of his terms of employment other than that he is tenured. *See*

Complaint, ¶ 12. As above noted, in assessing the instant motions this Court is limited to the factual material contained in the Complaint. Fed.R.Civ.P. rule 12(b).

**9.** This Court believes that the defendants' counsel is mistaken in having discerned an implied state law breach of contract claim in the Complaint. More correctly, the allegations of detrimental reliance should be understood to buttress the due process contentions.

damages for each claim is struck except insofar as the individual defendants are named only in their individual capacities but that in all other respects the defendants' motions to dismiss are denied.[10]

---

**10.** The plaintiff had requested sanctions for having to defend against these supposedly frivolous motions. Such request is also denied. However, this Court notes its displeasure with defense counsel's failure to apprise it of legal authorities in support of her motions even after this Court had made a specific request and she had promised such in open court. *See* fn. 1, hereinabove. The lack of investigation which went into the bringing of these motions is manifest and, had there been nothing at all to dismiss, sanctions would have been forthcoming. Defense counsel appears to have taken a shot in the dark; she's fortunate to have nicked her target.