Jesus R. **Sablan**,
Plaintiff/Appellant,

v.

Froilan C. **Tenorio**, Governor,
Commonwealth of the
Northern Mariana Islands,
Juan S. Demapan, Paul A. Manglona,
David M. Cing, Eusebio A. Hocog,
Ricardo S. Atalig, Senators, and the
Ninth Commonwealth Legislature,
Defendants/Appellees.
Appeal No. 94-034
Civil Action No. 94-0500
April 18, 1996

Argued and Submitted July 6, 1995

Counsel for appellant: Theodore R. Mitchell and Jeanne H. Rayphand, Saipan.

Counsel for appellee Governor Froilan C. Tenorio: Douglas M. Muir, Assistant Attorney General, Saipan.

Counsel for appellee Commonwealth Senate: Stephen C. Woodruff, Legislative Counsel, Saipan.

Counsel for appellee Senators Demapan, Manglona, Cing, Hocog and Atalig: Michael W. Dotts (Law Offices of Robert O'Connor), Saipan.

Counsel for appellee Commonwealth House of Representatives: Maya B. Kara, Legislative Counsel, Saipan.

Amicus Curiae: Howard P. Willens, pro se, Saipan.

BEFORE: VILLAGOMEZ and ATALIG, Justices, and MACK, Special Judge.

VILLAGOMEZ, Justice:

■ The appellant, Jesus R. Sablan ("Sablan"), appeals the trial court's decision dismissing certain of his claims and entering summary judgment for the appellees on other claims.

We have jurisdiction under 1 CMC § 3102(a). We affirm as to those issues we have decided to review.

## ISSUES & STANDARDS OF REVIEW

Sablan presents five issues for our review:

I. Whether the appellees, Governor Froilan C. Tenorio ("Governor") and the Ninth Commonwealth Legislature ("legislature"), have legislative immunity from Sablan's action challenging the apportionment of the Senate under 42 U.S.C. § 1983 ("§ 1983").

The trial court dismissed Sablan's § 1983 actions against the Governor and the legislature without citing a specific subsection of Com. R. Civ. P. 12. However, we infer from the court's clearly stated reason for the dismissals that it invoked Com. R. Civ. P. 12(b)(6).

■ Legislative immunity is an affirmative defense which provides absolute, comprehensive protection from suits challenging actions taken in the performance of official legislative functions. Where the complaint itself establishes legislative immunity, a § 1983 action should be dismissed under Com. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.[1] A dismissal under Com. R. Civ. P.

12(b)(6) is reviewed de novo.[2]

■ We base our review on the contents of Sablan's complaint, construe it in the light most favorable to him,[3] and accept all well-pleaded facts as true.[4] The dismissal will be deemed proper if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[5]

■ II. Whether the composition of the Senate of the Ninth Commonwealth Legislature violates the rights, under the Fourteenth Amendment to the U.S. Constitution, of the residents of Saipan to equal protection of the law. The trial court granted summary judgment as to this claim. Our review is, therefore, de novo.[6]

■ III. Whether the trial court erred by making findings of fact in a summary judgment proceeding when those facts were disputed. This issue challenges the propriety of deciding factual matters in the context of ruling on cross-motions for summary judgment and a preliminary injunction. This is a question of law which we review de novo.

IV. Whether the claim that the May 13, 1994, election of new Senate officers violated the Senate Rules of Procedure ("Senate Rules") is a political question. The trial court dismissed this claim and, as with the § 1983 action, the court did not cite a specific procedural rule. Nevertheless, from the reasoning underlying the dismissal, we infer that the court invoked Com. R. Civ. P. 12(b)(6).

---

267 F.2d 386, 387 (9th Cir.) (per curiam) (holding that trial court had jurisdiction and properly granted summary judgment dismissing complaint on ground that state supreme court justices are immune from § 1983 suit for damages), *cert. denied*, 361 U.S. 848, 80 S. Ct. 106, 4 L. Ed. 2d 87 (1959). *But see Partington v. Gedan*, 961 F.2d 852, 860 n.8 (9th Cir.) (dictum) (suggesting, with respect to § 1983 claim, that issue of absolute immunity is jurisdictional), *cert. denied*, 506 U.S. ___, 113 S. Ct. 600, 121 L. Ed. 2d 537 (1992).

[2] *Cepeda v. Hefner*, 3 N.M.I. 121, 126 (1992).

[3] *Cf. Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90, 96 (1974) (discussing federal court's assessment of complaint's sufficiency in § 1983 actions).

[4] *Govendo v. Micronesian Garment Mfg., Inc.*, 2 N.M.I. 270, 283 (1991); *see also Saffioti v. Wilson*, 392 F. Supp. 1335, 1337 n.1 (S.D.N.Y. 1975) (discussing assessment of § 1983 actions under Fed. R. Civ. P. 12(b)(6)).

[5] *Govendo*, 2 N.M.I. at 283; *see also Saffioti*, 392 F. Supp. at 1337 n.1.

[6] *King v. Board of Elections*, 2 N.M.I. 398, 401 (1991).

---

[1] *See Robinson v. Bergstrom*, 579 F.2d 401, 404 (7th Cir. 1978) (holding that question whether defendant is qualifiedly or absolutely immune "is not a jurisdictional issue[; r]ather, immunity is an affirmative defense which may defeat the section 1983 claim once that subject matter jurisdiction has been established"), *overruled on other grounds*, *Polk County v. Dodson*, 454 U.S. 312, 321, 102 S. Ct. 445, 451, 70 L. Ed. 2d 509, 518 (1981) (by implication); *see also Larsen v. Gibson*,

■ A determination that the alleged Senate Rules violation constituted a nonjusticiable political question should have led to a dismissal for failure to state a claim under Com. R. Civ. P. 12(b)(6).[7] Our review is de novo.[8]

■ V. Whether the Senate violated the Commonwealth's Open government Act of 1992[9] ("Open Government Act") during the special session of the Senate called by the Governor and held on May 13, 1994. We will not review this issue because we conclude, as the parties have suggested, that the question is now moot.[10]

## FACTUAL & PROCEDURAL BACKGROUND

Under Section 203(c) of the COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA ("Covenant")[11] and N.M.I. Const. art. II, § 2(a), the Commonwealth is divided into three senatorial districts: Saipan,[12] Tinian, and Rota. The population of the Saipan senatorial district exceeds the population of the other two senatorial districts by more than ten times. Notwithstanding this disparity, each senatorial district is equally allotted three seats in the Commonwealth Senate.

### I. Senate Session

On January 10, 1994, at the first regular session of the Ninth Commonwealth Legislature, Sablan was elected Senate President and the Senate adopted the official Rules of the Senate for the Ninth Commonwealth Legislature.

On May 11, 1994, three Senators asked Sablan in writing to call a special Senate session for that day. Four other Senators signed a request asking the Governor to call a special Senate session for, among other purposes, considering matters "relating to Senate leadership organization."[13] The Governor called a special Senate session for 5:00 p.m. the same day.

Although Sablan did not call a special Senate session for that day, he did call a special session for May 13, 1994, at 1:00 p.m. to consider "[r]econsideration of the Government Reorganization Plan."[14] The call, which was distributed to the media, did not list "Senate leadership organization" as an item on the agenda. Sablan asked the Governor to rescind his call for a session at 5:00 p.m., noting that the Governor's call was not supported by a majority of the Senate, and that there should have been a longer notice period. In response, acting Governor Jesus C. Borja rescinded the call for the special Senate session at 5:00 p.m. No special Senate session took place on May 11.

On May 13, 1994, Sablan canceled the special Senate session he had called for 1:00 p.m. However, at the request of five Senators who wanted to consider

---

[7] Cf. Brown v. Hansen, 973 F.2d 1118, 1121 (3d Cir. 1992) (noting that effect of political question doctrine is not to deprive courts of subject matter jurisdiction, but rather to preclude court "from granting relief that would violate the separation of powers mandated by the [federal] Constitution") (citing Powell v. McCormack, 395 U.S. 486, 516-17, 89 S. Ct. 1944, 1961-62, 23 L. Ed. 2d 491, 514 (1969)); see also United States Dept. of Commerce v. Montana, 503 U.S. 442, ___, 112 S. Ct. 1415, 1425, 118 L. Ed. 2d 87, 101 (1992) ("When a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue").

[8] Cepeda, 3 N.M.I. at 126.

[9] PL 8-41 (enacted Jan. 21, 1994) (codified as amended at 1 CMC § 9901 et seq.).

[10] The Ninth Commonwealth Legislature ceased to exist on January 8, 1996. Consequently, the Court can no longer grant the relief requested by Sablan. See Govendo, 2 N.M.I. at 281. Furthermore, after the filing of this lawsuit, the legislature repealed that portion of the Open Government Act expressly making the Act applicable to the legislature. See PL 8-41, § 14, repealed by PL 9-2, § 5. Thus, unlike issue IV, infra, the present issue is not amenable to consideration by the Court as a dispute capable of repetition yet evading review. See Mitchell v. Dupnik, 75 F.3d 517, 528 (9th Cir. 1996).

[11] 48 U.S.C. § 1801 note, reprinted in CMC at B-101 et seq. ("Covenant").

[12] The Saipan Senatorial District includes the islands to Saipan's north, collectively known as the Northern Islands. The Commonwealth Constitution provides for the establishment of a fourth Northern Islands senatorial district when the population of the Northern Islands exceeds one thousand persons. N.M.I. Const. art. II, § 2(a). For purposes of this opinion, all further references to Saipan will be taken to include the Northern Islands.

[13] Sablan v. Tenorio, Civ. No. 94-0500 (N.M.I. Super. Ct. July 18, 1994) (Memorandum Decision on Motions to Dismiss and Judgment at 4).

[14] Id.

matters "relating to Senate leadership organization,"[15] the Governor called a special Senate session for 2:30 p.m.

At 2:45 p.m., the appellees, Senators Demapan, Cing, Manglona, Hocog and Atalig ("Named Senators"), met in special session. The session was open to the public and attended by members of the media. The Named Senators voted to suspend Senate Rules 1 and 9, and then elected Senator Demapan to replace Senator Sablan as Senate President.

## II. Court Action

On May 16, 1994, Sablan filed a complaint and motion for a temporary restraining order (TRO) and preliminary injunction. Following a hearing, the trial court denied the motion for a TRO and set the matter for supplemental briefing and a hearing on Sablan's motion for a preliminary injunction.

Sablan subsequently filed an amended complaint and a second amended complaint for declaratory and injunctive relief. The second amended complaint includes a claim under § 1983[16] alleging that the Governor and legislature, by failing to reapportion the Senate, violated Sablan's right, secured by the Fourteenth Amendment to the U.S. Constitution, to equal protection of the law. The second amended complaint does not, on its face, include a direct cause of action under the U.S. Constitution.

On June 29, 1994, Sablan filed a motion for partial summary judgment and the Governor and Named Senators filed motions to dismiss the second amended complaint. The trial court issued an order on July 5, 1994, consolidating Sablan's motion for a preliminary injunction with trial on the merits under Com. R. Civ. P. 65(a).

On July 6, 1994, the House of Representatives ("House") filed a motion to dismiss, and the Named

---

[15] *Id.* at 5.

[16] Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Senators, legislature and Governor filed cross-motions for summary judgment. The trial court conducted a hearing on the Governor's, Named Senators' and legislature's motions to dismiss, and separately heard all remaining motions on July 13, 1994.

On July 18, 1994, the trial court issued a "Memorandum Decision on Motions to Dismiss and Judgment." The court dismissed, as a nonjusticiable political question, the claim that the Senate violated its rules, dismissed the § 1983 claims against the legislature and Governor on grounds of legislative immunity, and ruled against Sablan on the merits on the Open Government Act and Senate apportionment claims.

Sablan filed a motion for reconsideration, which the court denied. He timely appealed.

## ANALYSIS

### I. Whether the Legislature and Governor Have a Viable Legislative Immunity Defense to Sablan's § 1983 Claim

In the fifth cause of action of Sablan's second amended complaint, he purports to set forth a statutory claim, averring in part that

the present composition of the Senate is violative of the Equal Protection Clause of the Fourteenth Amendment [to] the Constitution of the United States . . . and . . . the plaintiff is entitled to relief pursuant to the federal Civil Rights Act, 42 U.S.C. § 1983.

Second Amended Complaint at 24. Sablan requests injunctive relief and, alternatively, a judicially-formulated plan to reapportion the Senate. The trial court granted the Governor and the legislature's motion to dismiss on the ground that absolute legislative immunity shielded these defendants from actions brought under § 1983.

With respect to the § 1983 issue, Sablan's entire argument on appeal consists of the statement that "[n]either the Legislature nor the Governor have legislative immunity from this reapportionment suit." Appellant's Brief at 69. In support of this conclusion, Sablan cites *Dyer v. Abe*,[17] a federal district court case. We find the ruling in *Dyer* unpersuasive in view of the U.S. Supreme Court's later decision in *Supreme Court of Virginia v.*

---

[17] 138 F. Supp. 220, 232 (D. Haw. 1956), *rev'd as moot*, 256 F.2d 728, 729 (9th Cir. 1958) (per curiam). This case has no progeny.

*Consumers Union of the United States, Inc.*,[18] which we discuss below.

Nevertheless, we will examine Sablan's second amended complaint to determine whether he could prove any set of facts that would entitle him to relief under § 1983.[19] We affirm the dismissal of the action against the legislature, but on different grounds than those cited by the trial court.[20] We also affirm the dismissal of the § 1983 action against the Governor.

■■■■ We must first consider whether the Governor and legislature are "persons" and therefore amenable to suit under § 1983.[21] Only if one or both defendants are persons will we proceed to address the question of legislative immunity.

### A. Whether the Legislature or the Governor is a "Person"

■■■■■ The Commonwealth "is not a 'person' within the meaning of § 1983."[22] Thus, "[n]either the [Commonwealth] nor its officers acting in their official capacity can be sued under § 1983."[23] With respect to the Commonwealth itself, this rule applies and thus bars suits for injunctive and monetary relief. However, with respect to its officers, when sued in their official (not personal) capacity, the same rule applies and bars only suits for monetary relief. Thus, officers still can be sued in their official capacity for injunctive relief.[24]

■■■■ "Commonwealth" means the Commonwealth government as a whole, and governmental entities that would be considered arms of the Commonwealth for purposes of immunity under the Eleventh Amendment[25] to the U.S. Constitution.[26] The Commonwealth Legisla-

---

[18] 446 U.S. 719, 100 S. Ct. 1967, 64 L. Ed. 2d 641 (1980).

[19] *See Govendo*, 2 N.M.I. at 283.

[20] The trial court's dismissal based on legislative immunity was not in error. However, the court did not have to reach that issue because, as we discuss below, the legislature is not a "person" under § 1983.

[21] The legislature and Governor made this argument below, in their joint motion to dismiss. *See* [Governor and Senate's] Notice of Motion to Dismiss, Motion to Dismiss, and Memorandum in Support of Motion to Dismiss at 3, [House of Representatives'] Notice and Motion to Dismiss at 2, *Sablan*, Civ. No. 94-0500 (N.M.I. Super. Ct. filed May 16, 1994). The Superior Court ruled against them, and they have not raised the argument again on appeal. However, we will consider this matter because we may affirm the trial court's decision on any ground that is supported in the record, *Partington*, 961 F.2d at 860, and because this question implicates our jurisdiction. *See DeNieva v. Reyes*, 966 F.2d 480, 482-83 (9th Cir. 1992).

[22] *DeNieva*, 966 F.2d at 483.

[23] *Id.*; *see also Ngiraingas v. Sanchez*, 495 U.S. 182, 192, 110 S. Ct. 1737, 1743, 109 E. Ed. 2d 163, 174 (1990) (holding, in a suit for monetary relief, that neither "Guam nor its officers acting in their official capacities are 'persons' under § 1983"); *Hafer v. Melo*, 502 U.S. 21, 26, 112 S. Ct. 358, 362,

116 L. Ed. 2d 301, 310 (1991) (holding that neither a state nor its officials when sued for monetary relief in their official capacities are "persons" under § 1983); Covenant § 502(a)(2) (a given federal law may be applicable to the Commonwealth if it is applicable to Guam and generally applicable to the states, as it is applicable to the states).

[24] *See DeNieva*, 966 F.2d at 483 & n.3 (making no distinction between prospective and monetary relief with respect to a state itself not being a "person" under § 1983, while noting that state *officers* are "persons" when sued in their official capacities for prospective relief, but are not persons when sued in official capacity for damages); *Derechin v. State Univ. of New York*, 731 F. Supp. 1160, 1164 (W.D.N.Y. 1989) (holding that state (university) is not a "person" under § 1983 in a suit for declaratory and injunctive relief).

[25] It is unsettled whether the Commonwealth enjoys Eleventh Amendment immunity. The Covenant contains no express provision making the Eleventh Amendment applicable to the Commonwealth. *See* Covenant § 501(a) (enumerating specific provisions of the U.S. Constitution applicable within the Commonwealth); *Fleming v. Department of Pub. Safety*, 837 F.2d 401, 406 & n.6 (9th Cir.) (holding, in § 1983 action, that Commonwealth does not enjoy Eleventh Amendment immunity from suit), *cert. denied*, 488 U.S. 889, 109 S. Ct. 222, 102 L. Ed. 2d 212 (1988), *overruling on other grounds* recognized in *DeNieva*, 966 F.2d at 483. Conducting the present analysis *as if* the Eleventh Amendment applies is nevertheless appropriate, because § 1983 applies to the Commonwealth "as [it is] applicable to the several states." Covenant § 502(a)(2). *See DeNieva*, 966 F.2d at 483.

[26] *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) (defining parameters of "state" which is not a "person" amenable to suit under § 1983); *Hafer*, 502 U.S. at 30, 112 S. Ct. at 364, 116 L. Ed. 2d at 312 (explaining that states are immune from § 1983 actions in both federal and state courts); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 & n.11, 104 S. Ct. 900, 908 & n.11, 79 L. Ed. 2d 67, 79 & n.11 (1984) (holding that suit in federal court is barred by Eleventh Amendment when a state is "the real, substantial party" sued, regardless of the type of relief sought).

ture is one such entity.[27]

Sablan's § 1983 cause of action runs in part against the legislature. Because the legislature is not a "person" within the meaning of § 1983, the trial court did not err in dismissing the action against the legislature.[28] However, the Superior Court dismissed as to both the legislature and the Governor on grounds that both parties have legislative immunity. Reaching this issue would be proper as to the legislature if the legislature were a "person" under § 1983.[29] The legislature not being a "person," the trial court need not have reached the immunity question.

 A different result obtains with respect to the Governor. The Governor is a Commonwealth officer who has been sued in his official capacity for injunctive relief. When sued in that capacity, the Governor constitutes a "person" under § 1983.[30] Therefore, we proceed to determine whether the Governor is shielded by legislative immunity.

## B. Whether Legislative Immunity Extends to the Governor

The Superior Court determined that legislative immunity provides the Governor with a viable defense to Sablan's action. Sablan contends that this holding is erroneous. We find no error.

 In the context of a § 1983 action, a state official who, as here, is sued for injunctive relief in her/his official capacity normally may not claim absolute immunity for her/his official action.[31] Officials who assert that they have such immunity "must show that [the] immunity is justified for the governmental function at issue."[32] To determine whether a particular task is legislative, executive or judicial for purposes of extending immunity, the function performed by the defendant officer, and not his or her title, is determinative.[33]

 With respect to officials engaged in legislative activity, the U.S. Supreme Court explained in *Consumers Union* that granting absolute immunity is justifiable

> to insure that the legislative function may be performed independently without fear of outside interference. To preserve legislative independence, . . . legislators engaged in the sphere of legitimate legislative activity should be pro-

---

[27] See *N.A.A.C.P. v. Committee on Offenses*, 114 S.E. 2d 721, 728 (Va. 1960) (holding that a suit against the Virginia Legislature is a suit against the state).

[28] See *Derechin*, 731 F. Supp. at 1164 (dismissing § 1983 actions for declaratory and injunctive relief against state university and university branch campus on ground that universities are state entities and therefore not "persons" under § 1983) (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-70, 109 S. Ct. 2304, 2308-11, 105 L. Ed. 2d 45, 53-57 (1989)).

[29] As noted above, even though it did not have to reach this issue with respect to the legislature, the Superior Court did not err in concluding that the legislature has a viable defense in the form of absolute legislative immunity. See *Consumers Union*, *supra*. In *Consumers Union*, a § 1983 action for declaratory and injunctive relief, the U.S. Supreme Court opined:

> [T]here is little doubt that if the Virginia Legislature had enacted the State Bar Code and if suit had been brought against the legislature, its committees, or members for refusing to amend the Code in the wake of our cases indicating that the Code in some respects would be held invalid, the defendants in that suit could successfully have sought dismissal on the grounds of absolute legislative immunity.

*Id.*, 446 U.S. at 733-34, 100 S. Ct. at 1975, 64 L. Ed. 2d at 654-55 (dictum) (footnote omitted); see also *Daggett v. Kimmelman*, 617 F. Supp. 1269, 1279 (D.N.J. 1985) (holding that legislature that enacted congressional redistricting plan would have been absolutely immune from a § 1983 suit if it had not intervened to defend the statute), *aff'd*, 811 F.2d 793, 795 n.2 (3d Cir. 1987).
The question whether a state legislature is a "person" within the meaning of § 1983 was neither argued nor decided in *Consumers Union* or *Daggett*. However, in *Consumers Union* the U.S. Supreme Court seemed to suggest that the Virginia Supreme Court might not be a "person" under § 1983. See 446 U.S. at 737 n.16, 100 S. Ct. at 1977 n.16, 64 L. Ed. 2d at 651 n.6.

[30] See *Will*, 491 U.S. at 70 n.10, 109 S. Ct. at 2312 n.10, 105 L. Ed. 2d at 58 n.10 (dictum); see also *Derechin*, 731 F. Supp. at 1164 (applying *Will* and holding that state university administrators acting in official capacities are "persons" under § 1983 when sued for prospective injunctive relief).

[31] See *Hafer*, 502 U.S. at 29, 112 S. Ct. at 364, 116 L. Ed. at 312.

[32] *Id.*, 502 U.S. at 29, 112 S. Ct. at 363, 116 L. Ed. 2d at 312.

[33] *Forrester v. White*, 484 U.S. 219, 227, 108 S. Ct. 538, 544, 98 L. Ed. 2d 555, 565 (1988) ("[I]mmunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches"); *Terry v. Bobb*, 827 F. Supp. 366, 368-69 (E.D.Va. 1993) (citing, inter alia, *Consumers Union*, *supra*).

tected not only from the consequences of litigation's results but also from the burden of defending themselves.[34]

The Court considered the specific issue of whether the Supreme Court of Virginia was immune from suit under § 1983 for the promulgation of the Virginia State Bar Code. The plaintiffs in *Consumers Union*, like Sablan, sought only declaratory and injunctive relief. The Court ruled that (1) the Virginia court acted in a legislative capacity when propounding the bar code,[35] and (2) when acting as a legislative body, the Virginia court enjoyed common law immunity for its legislative acts,[36] defined as "acts undertaken in a field where legislators traditionally have power to act."[37]

■ In the case at bar, we must focus not on the Governor's title, but rather on the affirmative duty that Sablan alleges that the Governor failed to perform. If the function in question is legislative, then the Governor is entitled to absolute immunity.

Sablan's second amended complaint "is essentially self-defeating"[38] because it contains the elements of a built-in defense of legislative immunity. Specifically, Sablan alleges that "[b]ecause the Commonwealth Legislature has failed to reapportion the Senate, it is incumbent upon the Governor to act, pursuant to Article II, § 4(b) of the Commonwealth Constitution." Second Amended Complaint at 17-18.[39] In his fifth cause of

action, brought pursuant to § 1983, Sablan asserts that he "is entitled to an injunction compelling the . . . defendant Tenorio . . . *to develop and submit* to [the] court a plan *which will establish* nine senatorial election districts." *Id.* at 24 (emphasis added). Finally, in his prayer for relief under his sixth cause of action, Sablan requests that the court "issue an affirmative injunction commanding [the Governor] . . . *to enact legislation* calling a special election for the purpose of electing the membership of the Senate in accordance with the new redistricting and reapportionment plan." *Id.* at 29 (emphasis added).

Thus, by its plain language the second amended complaint makes clear that Sablan is not demanding that the Governor be compelled to act in an executive capacity. Rather, he is requesting that the Governor be required to perform a constitutionally-delegated[40] legislative function.[41] The trial court correctly held that, under these circumstances, the Governor enjoys absolute immunity from Sablan's suit for prospective relief under § 1983.

## II. Whether the Legislature and Governor were Entitled to Summary Judgment on the Merits of the Senate Apportionment Claim

The trial court granted summary judgment in favor of the legislature and the Governor, holding that "the composition of the Commonwealth Senate offends neither the Fourteenth Amendment to the U.S. Constitution nor Art. I, § 6 of the Commonwealth Constitution."[42] Sablan

---

[34] *Consumers Union*, 446 U.S. at 731-32, 100 S. Ct. at 1974, 64 L. Ed. 2d at 351 (internal quotation marks and citations omitted).

[35] *Id.*, 446 U.S. at 731, 100 S. Ct. at 1974, 64 L. Ed. 2d at 351.

[36] *Id.*, 446 U.S. at 734, 100 S. Ct. at 1976, 64 L. Ed. 2d at 655; *see also Daggett*, 617 F. Supp. at 1279 (holding that when legislature intervened in suit in order to defend statute being challenged under § 1983, it "took on a quasi-enforcement role, and gave up its immunity").

[37] *Consumers Union*, 446 U.S. at 733, 100 S. Ct. at 1975, 64 L. Ed. 2d at 654 (internal quotation marks and citation omitted).

[38] 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1990) (discussing situations in which a plaintiff's own allegations demonstrate that a defense exists, entitling defendant to dismissal of the action based on plaintiff's failure to state a claim).

[39] Article II of the Commonwealth Constitution establishes the "*Legislative* Branch" of the government. N.M.I. Const. art. II, § 4(b) provides, in pertinent part, that "[i]f the legislature

fails to act pursuant to section[] 4(a) [to redistrict or reapportion the House of Representatives], the governor shall *promulgate* a reapportionment or redistricting plan." (Emphasis added.)

[40] We do not reach the question of whether N.M.I. Const. art. II, § 4(a) (providing for reapportionment and redistricting of the House of Representatives) could be used as a basis for compelling the Governor to reapportion or redistrict the Senate, as opposed to the House of Representatives.

[41] Courts have permitted § 1983 suits to proceed against governors who have performed or failed to perform *executive* functions, such as enforcing allegedly unconstitutional election districting laws. *See, e.g., Roberts v. Babcock*, 246 F. Supp. 396, 399 (D. Mont. 1965) (enjoining governor and secretary of state from "in any manner enforcing or recognizing" state statute apportioning congressional districts, and from "proclaiming, certifying or conducting any election" of members of Congress).

[42] *Sablan, supra* (Memorandum Decision on Motions to Dismiss and Judgment at 30).

contends that the Superior Court erred in granting judgment against him on the merits. The parties and amicus extensively discussed this issue. However, as further explained below, the procedural stance of this case made it unnecessary for the Superior Court to decide the merits of Sablan's claim that the Senate's apportionment violates his right to equal protection[43]

---

[43] Due to the importance of the Covenant issue, we note that if the matter were properly before us we would affirm on the merits based not only on the Superior Court's reasoning, but also on the following factors.

The relationship between the U.S. and the CNMI is governed solely by the Covenant, not the U.S. Constitution. *United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754 (9th Cir. 1993). The Covenant is not simply a statute enacted by the U.S. Congress. *Sablan v. Inos*, 3 N.M.I. 418, 428 (1993). It is a bilateral international agreement which required mutual consent and, after years of negotiations, established a unique and unprecedented political union between the U.S. and the people of the NMI.

Prior to the effective date of the Covenant, none of the U.S. Constitutional provisions applied in the NMI. Sovereignty resided in the people of the NMI. The NMI was not a U.S. "territory" and did not become a U.S. "territory" by uniting politically with the U.S. through the Covenant. A "territory" is subject to the plenary power of Congress pursuant to the Territorial Clause. U.S. Const. art. IV, § 3, cl. 2. Although Covenant § 101 provides that the CNMI is under U.S. sovereignty, Covenant § 105 limits U.S. sovereignty by giving express recognition to the CNMI's right of self-government, and to the fundamental provisions (Articles I, II, III and Sections 501 and 805) of the Covenant which cannot be altered without the mutual consent of the parties.

In view of this, it would be incorrect to conclude that in approving and effectuating the Covenant's terms, the U.S. Congress and President derived their authority from the Territorial Clause. Rather, the U.S. Government's authority to negotiate and become a party to the Covenant may properly be said to have derived from the treaty power, U.S. Const. art. II, § 2, cl. 2, and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18. It is the broad authority granted under these provisions that enables the U.S. government to enter into treaties and enact laws that, as in the case of the Covenant, it deems necessary to protect U.S. security and other national interests.

The Covenant's negotiating history shows that absent the Covenant's fundamental provisions, no agreement would have been possible. *Commonwealth of the N. Mariana Islands v. Atalig*, 723 F.2d 682, 685-86 (9th Cir.), *cert. denied*, 467 U.S. 1244, 104 S. Ct. 3518, 82 L. Ed. 2d 826 (1984). One such fundamental provision is Section 203, providing for composition of the Senate.

A Senate apportioned by island is one feature of the government chosen by the people of Saipan, Rota, and Tinian in the exercise of their right of self-determination. The people desired a representative republican form of government, with a bicameral legislature, akin to that of the Congress of Micro-

under the U.S. Constitution.[44]

■ When properly invoked, defenses such as absolute immunity from suit under § 1983 defeat an action at the outset.[45] A court need not proceed further; it should "not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."[46] It was unnecessary, therefore, for the Superior Court to determine whether Sablan has been deprived "of any rights, privileges, or immunities secured by the Constitution."[47]

■ Having determined that Sablan was barred from bringing a statutory action under § 1983, it would not avail this Court to search Sablan's second amended complaint to determine whether he stated an implied cause of action directly under the U.S. Constitution. Sablan can state no such direct cause of action because, under the facts before us, federal law requires that "a litigant complaining of a violation of a constitutional right . . . utilize 42 U.S.C. § 1983."[48]

---

nesia and the U.S. Congress.

The composition of the Senate does not transgress international norms recognizing the right of all people to vote. Section 203's inclusion in the Covenant should, therefore, be upheld as a proper and valid exercise of the U.S. Government's authority under the U.S. Constitution.

[44] In his appellate briefs, Sablan argues only that the trial court erred in granting summary judgment as to his claim that apportionment of the Commonwealth Senate violates his rights under the federal Constitution. *See* Appellant's Brief at 1, 37. The propriety of the Superior Court's grant of summary judgment as to Sablan's claim under the Commonwealth Constitution is not, therefore, an issue properly before us.

[45] *Haynesworth v. Miller*, 820 F.2d 1245, 1265-66 (D.C.Cir. 1987).

[46] *Ashwander v. T.V.A.*, 297 U.S. 288, 347, 56 S. Ct. 466, 483, 80 L. Ed. 2d 688 (1936) (Brandeis, J., concurring).

[47] 42 U.S.C. § 1983.

[48] *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) (citations omitted), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1049, 122 L. Ed. 2d 357 (1993); *Thomas v. Shipka*, 818 F.2d 496, 499 (6th Cir.) (holding that, where plaintiff states a constitutional claim under § 1983, that statute provides exclusive remedy for alleged constitutional violations), *reh'g in part on other grounds denied*, 829 F.2d 570 (6th Cir. 1987), *vacated in part on other grounds*, 488 U.S. 1036, 109 S. Ct. 859, 102 L. Ed. 2d 984 (1989) (mem.), *on remand in part on other grounds*, 872 F.2d 772, 773 (6th Cir. 1989) (emphasizing that relevant portion of original opinion was never appealed and remains good law).

■ Section 1983 is not a source of substantive rights, but rather provides a means of vindicating federal rights[49] conferred by, for example, the Fourteenth Amendment and other provisions of the U.S. Constitution. Section 1983 "provides a substitute remedy which is equally effective to a direct cause of action under the Constitution."[50] Thus, as a matter of law, Sablan's § 1983 cause of action subsumes any action that he might purport to state directly under the Fourteenth Amendment.[51]

Finally, even if we were to recognize the existence of an implied direct cause of action under the Fourteenth Amendment,[52] the legislature and the Governor could invoke the same immunity defenses that led to the dismissal of the § 1983 actions.[53]

## III. Whether Findings of Fact were Erroneously Made during Grant of Summary Judgment on Merits of Senate Apportionment Claim

Sablan contends that the trial court erred by making certain material findings of fact while granting summary judgment against him on his claim that the apportionment of the Commonwealth Senate violates the U.S. and Commonwealth Constitutions. We have stated above that the trial court should not have reached the merits of the Senate apportionment issue. Any error arising from the Superior Court's making of findings of fact during its adjudication of the merits is, therefore, inconsequential for purposes of our review.

## IV. Whether the Senate Rules Violation Claim is a Nonjusticiable Political Question

Sablan alleges that in the process of electing Senator Demapan to replace Sablan as Senate President, the Named Senators violated one of the Senate Rules. Specifically, Sablan asserts that there was a transgression of Rule 1(2),[54] which pertains to Senate officers' terms of office.

Sablan maintains that the election of Senator Demapan must be declared null and void as a result of the alleged Senate Rules violation. The Superior Court found this to be a nonjusticiable political question and dismissed the claim. On appeal, Sablan contends that the court "has the duty to say what the law is," Appellant's Brief at 74, notwithstanding concerns regarding separation of powers. Prior to addressing the justiciability question and potentially the merits, we must determine whether this issue has become moot. We conclude that this matter, while technically moot, is still subject to review because it falls within an exception to the mootness doctrine. Furthermore, we hold that under the facts of this case, the trial court did not err in its ruling.

---

[49] *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694 n.3, 61 L. Ed. 2d 433, 442 n.3 (1979).

[50] *Thomas*, 818 F.2d at 500 (concluding "that it is unnecessary and needlessly redundant to imply a cause of action arising directly under the Constitution where Congress has already provided a statutory remedy of equal effectiveness through which the plaintiff could have vindicated [his] constitutional rights"); *see also Haynesworth*, 820 F.2d at 1248 n.1 (opining that, if recognized by a court, an implied right to sue directly under the federal Constitution for civil rights violations should mirror § 1983—the express statutory cause of action—to the fullest possible extent).

[51] *See Valerio v. Dahlberg*, 716 F. Supp. 1031, 1036 (S.D. Ohio 1988).

[52] *See, e.g., Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir. 1979) (en banc) (suggesting that plaintiff might have been permitted to bring a direct cause of action under the Constitution if defendant municipality were not a "person," and therefore were not amenable to suit, under § 1983).

[53] *See Haynesworth*, 820 F.2d at 1264 n.151 (finding it unnecessary, for the purpose of assessing immunity from suit, to distinguish between implied actions against federal officers brought directly under the Constitution from suits brought against state officers under § 1983); *Hearth, Inc. v. Department of Pub. Welfare*, 617 F.2d 381, 383 (5th Cir. 1980) (per curiam) (dictum); *see also Thomas*, 818 F.2d at 500 (noting that the same standards of immunity apply to suits brought directly under the Constitution and under § 1983 because "both provide remedies for violations of the same constitutional protections").

[54] The relevant portion of the rule provides:

The President, Vice President, Floor Leader, and Senate Legislative Secretary, shall hold office until the next Legislature is called to order, until noon on the second Monday in January following the next general election unless such tenure be terminated at an earlier date by death or resignation. . . . This rule shall not be suspended without a unanimous vote of the total membership of the Senate and shall not be amended without the unanimous vote of the total membership of the Senate.

Official Rules of the Senate, Ninth Northern Marianas Commonwealth Legislature, 1(2) (1994).

## A. Mootness

 The Court takes judicial notice of the fact that during the pendency of this appeal, the Ninth Commonwealth Legislature ceased to exist and Sablan was elected President of the Senate of the Tenth Commonwealth Legislature. The Court can no longer grant Sablan relief in the form of reinstatement to the Presidency of the Senate of the Ninth Commonwealth Legislature.

 This Court's duty "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."[55] Moreover, we have previously decided that for policy reasons Commonwealth courts lack jurisdiction to decide moot issues.[56]

 The mootness doctrine has exceptions, however, one of which applies where (1) the issue raised affects the public interest, (2) similar issues are likely to arise in the future, and (3) the issue will probably become moot prior to completion of review by an appellate tribunal.[57] The present case fits squarely into this exception.

 The Senate of each Commonwealth Legislature adopts its own rules of procedure. Disputes among legislators as to interpretation of the rules have been litigated,[58] and may well in the future be brought to the courts for resolution. Sablan may, for example, be removed again from the Senate presidency by the same or similar means as used in the case at bar, which would likely result in the reappearance of the issue now before us. Furthermore, to the extent that this matter affects the operation of the Senate, it also affects the public interest. Finally, the relatively brief two-year life of each Senate means, in addition to the fact that controversies like the one before us may occur at any time within each two-year period, that appellate review might be made problematic due to mootness. We therefore conclude that review of this issue comes within the proper exercise of our jurisdiction.

## B. Justiciability

 The separation of powers concept came into being "to safeguard the independence of each branch of the government and protect it from domination and interference by the others."[59] The separation of powers concept takes the form of the "political question" doctrine in the context of judicial review of legislative and executive decisions.

The political question doctrine—a doctrine of judicial abstention—comes into play when the controversy brought before the court (1) involves a decision made by a branch of the government coequal to the judiciary, and (2) concerns a political matter. The presence of a political question renders the controversy nonjusticiable. In other words, it immunizes the disputed legislative or executive decision from judicial scrutiny.[60]

 The assessment of whether a given controversy presents a political question must be made on a case-by-case basis. A number of factors may be considered in this analysis: whether there is a textually demonstrable commitment of the issue to a coordinate branch of government; whether judicially discoverable and manageable standards for assessing the dispute are lacking; whether a court could render a decision without also making an initial policy determination that clearly should be left to another branch; whether it would be possible for a court independently to resolve the case without undercutting the respect due to coordinate branches of government; whether there is an unusual need to adhere to a political decision already made; or whether an embarrassing situation might be created by various governmental departments ruling on one question.[61] With respect to the present case, multiple factors weigh heavily in favor of abstention from judicial review of the Senators' actions.

 The Commonwealth Constitution empowers each house of the legislature to "choose the presiding officer from among its members, . . . and promulgate rules of procedure."[62] We read the term "promulgate" to include the power to interpret, suspend, waive and

---

[55] *In re Seman*, 3 N.M.I. 57, 64 (1992).

[56] *Govendo*, 2 N.M.I. at 281.

[57] *Seman*, 3 N.M.I. at 64-65.

[58] *See, e.g., Mafnas v. Inos*, 1 N.M.I. 101 (1990).

[59] 2 Chester J. Antieau, MODERN CONSTITUTIONAL LAW § 11:13 (1969) (discussing separation of powers doctrine under the federal Constitution).

[60] *See id.* § 11:19.

[61] *See Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L. Ed. 2d 663, 685-86 (1962).

[62] N.M.I. Const. art. II, § 14(b).

enforce[63] the rules by any constitutional means.[64] By refraining from interfering with the Senate's constitutionally-exercised power to promulgate rules, we accord proper respect to the legislature as a separate and coequal branch of government which must be free from domination and unnecessary intrusion by the judiciary.

We also believe it is necessary to adhere to a political decision already made. Sablan was replaced by Senator Demapan, the Senate resumed its legislative duties, and it has continued to function since the leadership change. As the Alaska Supreme Court observed in a factually similar case, "[i]ntervention by a court at this point would be apt once again to disrupt the legislative processes . . . . Nor is it at all clear that judicial intervention during the reorganization would have shortened it or otherwise have been of benefit."[65]

Sablan suggests that *Mafnas v. Inos*[66] stands for the proposition that Senate Rules, once promulgated, must be enforced by the courts. Our ruling in *Mafnas* is not as broad as Sablan submits. Review might be merited here if Sablan's claim presented cognizable constitutional questions, as in *Mafnas*. However, as the Superior Court correctly ruled, this is not the case in this dispute.

*Mafnas* concerned a dispute in which the Senate split into two competing factions, effectively paralyzing the legislative branch and significantly impeding the executive branch's ability to function: "[T]he lower house of the legislature and the executive branch of the Government of the Northern Marianas could not work with the [S]enate and the [S]enate could not function."[67] In determining that we should exercise jurisdiction, we implicitly recognized the constitutional dimensions of the controversy: "Absent expeditious resolution of the dilemma, the Commonwealth Government would remain crippled. No laws could be passed and the new Governor's executive appointments could not be acted upon."[68]

The gravity of the situation in *Mafnas* merited judicial intervention.

In a well-reasoned analysis, the Superior Court determined that Sablan's grievance concerning the Senators' interpretation of and adherence to the Senate Rules was not of constitutional magnitude.[69] The court properly declined to address the merits of the issue,[70] and we will not disturb that decision.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the decision of the Superior Court.

---

MACK, Special Judge, concurring in part and dissenting in part:

I concur with the majority's decision and opinion set forth in sections IV (regarding claimed violation of the Senate Rules) and V (regarding claimed violation of the Open Government Act).

I concur with the decision to affirm the dismissal of the remaining claims against the legislature and individual Senators, but for the reasons set forth in the lower court's decision. I respectfully dissent from the majority's opinion set forth in sections I, II and III and from its decision to affirm the dismissal of the claims against the Governor. As to those claims, I would reverse.

## I

The plaintiff, Jesus R. Sablan, is a citizen of the United States of America, a resident of Saipan, Commonwealth of the Northern Mariana Islands (CNMI), and an elected official, a Senator in the CNMI Legislature. He filed suit in the Superior Court against the CNMI Governor, Ninth Commonwealth Legislature and some individual Senators, challenging actions by the Governor and Senate removing him from his position as President

---

[63] *Mafnas*, 1 N.M.I. at 105 n.1.

[64] *Cf. Moffitt v. Willis*, 459 So.2d 1018, 1021 (Fla. 1984) (interpreting similar provision of Florida Constitution).

[65] *Malone v. Meekins*, 650 P.2d 351, 357 (Alaska 1982).

[66] *See supra* note 58.

[67] *Id*. at 104.

[68] *Id*. at 105. *See* N.M.I. Const. art. II, §§ 1 (legislative duties vested in legislature), 7 (power of Governor to act on bills after passage by legislature), art. III, § 14 (duty of Governor to appoint heads of executive departments with advice and consent of the Senate).

[69] *See Sablan, supra* (Memorandum Decision on Motions to Dismiss and Judgment at 7-9) (citing, inter alia, *Malone v. Meekins*, 650 P.2d 351, 355-56 (Alaska 1982)).

[70] *See Montana*, 503 U.S. at ___, 112 S. Ct. at 1425, 118 L. Ed. 2d at 101-02; *Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992) ("If the defendant [legislator]s' conduct here did not violate any constitutional or statutory provision, the question whether the legislature violated its own internal rules is nonjusticiable").

of the Senate. Sablan included an equal protection claim under the CNMI Constitution, the U.S. Constitution and 42 U.S.C. § 1983,[71] alleging that his voting rights had been illegally infringed and diluted due to the malapportionment of the CNMI Senate districts. He sought declaratory and injunctive relief regarding this latter claim, asking that Covenant[72] § 203(c) and N.M.I. Const. art. II, § 2(a), which mandate Senate districts based on geography rather than population, be declared unconstitutional and that the legislature and Governor be ordered to reapportion the Senate.

### Justiciability

The lower court ruled that the constitutionality of Covenant § 203(c) is a justiciable question. Apportionment is not a non-justiciable political question. *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Nor is the Covenant beyond the purview of constitutional challenge. *Commonwealth v. Atalig*, 723 F.2d 682 (9th Cir.), *cert. denied*, 467 U.S. 1244, 104 S. Ct. 3518, 82 L. Ed. 2d 826 (1984); *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir.), *cert. denied sub nom.*, *Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 675, 121 L. Ed. 2d 598 (1992); *see also* Covenant § 903 (permitting judicial review of Covenant issues). The lower court fully and correctly discussed these authorities and the issue. For the reasons stated in the lower court's decision, I agree that this challenge to the apportionment of the Senate presents a justiciable case.

### II

The lower court also ruled that Commonwealth officials, including the Governor, when sued in their official capacities for injunctive relief, are "persons" under 42 U.S.C. § 1983. It did not reach the issue of whether members of the Ninth Commonwealth Legislature are also "persons" under the federal statute because

it held that the legislature has absolute immunity. The majority takes issue with the lower court's order of analysis. I would affirm the lower court's ruling that the Governor, acting in his official capacity, is a "person" in a suit for declaratory and injunctive relief under § 1983. I would also affirm the lower court's decision to dismiss the § 1983 claim against the legislature and individual Senators because of legislative immunity.

### Legislative Immunity

Absolute legislative immunity[73] shields legislatures and legislators from having to answer or defend suits based on the conduct of legitimate legislative activity. *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 731-732, 100 S. Ct. 1967, 1974-1975, 64 L. Ed. 2d 641, 653-654 (1980). Under Sablan's sole claim[74] against the legislature, he seeks a court order directing it to enact legislation creating a different apportionment scheme.[75] The court cannot do this without upsetting the separation of powers fundamental to the U.S. and CNMI constitutions. *Consumers Union, supra.* The legislature and individual legislators are absolutely immune from the claim for relief for the alleged unconstitutional apportionment.[76]

---

[71] Sablan also pleaded, in general language, a substantive due process claim under the U.S. Constitution for the infringement of his voting rights. This claim may be cognizable in light of *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S. Ct. 1187, 1190, 12 L. Ed. 2d 218, 222 (1964), and *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693, 694, 98 L. Ed. 884 (1954). *See* note 80, *infra*.

[72] COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA, 48 U.S.C. § 1801 note, *reprinted in* CMC at B-101 et seq. (hereinafter "Covenant).

[73] "Absolute" legislative immunity is not, in fact, absolute. It applies only to *legitimate* legislative activity. *Dombrowski v. Eastland*, 387 U.S. 82, 87 S. Ct. 1425, 18 L. Ed. 2d 577 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 71 S. Ct. 783, 95 L. Ed. 1019 (1951).

[74] Sablan makes no allegation that the legislature or Named Senators acted beyond the scope of legitimate legislative action. "A legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act." *City of Cedar Rapids v. Cox*, 108 N.W.2d 253, 262-63 (Iowa 1961) (*cited in Baker v. Carr*, 369 U.S. 186, 250 n.5, 82 S. Ct. 691, 727 n.5, 7 L. Ed. 2d 663, 705 n.5 (1962)).

[75] There are cases in which a legislature is a defendant in an apportionment case. *See, e.g.*, *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 84 S. Ct. 1459, 12 L. Ed. 2d 632 (1964). Apparently, in *Lucas* the defendants did not raise the issue of legislative immunity.

[76] The legislature or individual legislators could waive this immunity and choose to defend the apportionment scheme, thereby making themselves liable in the future for attorney fees if the scheme is declared unconstitutional. *Daggett v. Kimmelman*, 617 F. Supp. 1269 (D.N.J. 1985), *aff'd*, 811 F.2d 793, 795 & n.2 (3d. Cir. 1987). Because our civil rules permit parties to plead in the alternative, the legislature's defense of the Covenant apportionment scheme should not be construed as

They need not defend and the court need not consider whether they are "persons" for purposes of a § 1983 claim.

The lower court granted the defendants' motion to dismiss the claims against the Governor on the ground that he also has absolute legislative immunity with respect to Sablan's claims. The court ruled that the Governor's constitutionally-mandated duty to create an apportionment scheme if the legislature fails to do so is a legislative task. The majority on appeal affirms this analysis. I disagree.

The Governor is constitutionally charged with some apportionment responsibilities. Under N.M.I. Const. art. II, § 4(b), the Governor must promulgate a reapportionment or redistricting plan if the legislature fails to act within a specified period. Sablan's claim against the Governor is based on this duty. I am not convinced that delegation of apportionment duty to the Governor under such circumstances means that the Governor then performs a legislative function. The cases cited by the lower court do not support its conclusion that the Governor is protected by legislative immunity.[77] In my view, the CNMI Constitution's delegation of duty to the Governor effectively makes gubernatorial apportionment an executive function,[78] further assisting the Governor in

_____

a waiver of the immunity defense, which was properly raised and argued. *Cf. Eslinger v. Thomas*, 476 F.2d 225, 228 (4th Cir. 1973) (legislative immunity not waived by failure to raise the defense in pleadings where it was raised at trial); *Connor v. Winter*, 519 F. Supp. 1337 (S.D. Miss. 1981) (although defense raised "belatedly," state legislators enjoyed absolute immunity from suit).

[77] In *Eslinger, supra*, cited by the lower court, the legislature was held immune for passing a resolution; the only claim against the governor and lieutenant governor related to their inaction when the plaintiff informally sought help in pushing the legislature to change its resolution. In *Saffioti v. Wilson*, 392 F. Supp. 1335 (S.D.N.Y. 1975), also cited by the lower court, the governor's exercise of veto power was at issue; the court held that he was not immune from suit and considered whether the veto was arbitrary or capricious. These cases do not support the proposition that apportionment, when constitutionally delegated to the executive branch under certain circumstances, is a legislative function.

[78] The majority cites *Forrester v. White*, 484 U.S. 219, 227, 108 S. Ct. 538, 544, 98 L. Ed. 2d 555 (1988). *Forrester*, as noted by the majority, does provide that determination of judicial immunity depends upon the function and not the person. The Court held that a judge does not automatically have judicial immunity for all acts; he is subject to suit by an employee for discrimination. In the instant case, it is the executive authority of the Governor that is at issue, in contrast to the non-judicial

the conduct of elections. It should be noted that N.M.I. Const. art. II, § 4(b) also requires the CNMI Supreme Court to fashion a redistricting plan if the Governor fails to act. This does not make the Court's job legislative, but judicial. *See In re Kansas Congressional Districts Reapportionment Cases*, 540 F. Supp. 1200, 1202 (D. Kan. 1982) (citing *White v. Weiser*, 412 U.S. 783, 93 S. Ct. 2348, 37 L. Ed. 2d 335 (1973)) ("Congressional redistricting is primarily the state legislature's task, but becomes a judicial task when the legislature fails to redistrict")..

Furthermore, executive functions relating to appointment of officials and general responsibility for elections make officers like governors amenable to § 1983 suits for malapportionment. *See, e.g., David v. Cahill*, 342 F. Supp. 463 (N.J. 1972) (governor, secretary of state and superintendent of elections enjoined from conducting further elections under unconstitutional plan); *In re Kansas Congressional Districts Reapportionment Cases*, 745 F.2d 610 (10th Cir. 1984) (court sustained action against governor and secretary of state and effectuated redistricting); *Wesberry v. Sanders*, 376 U.S. 1, 84 S. Ct. 526, 11 L. Ed.2d 481 (1964) (overruling lower court, Supreme Court sustained apportionment challenge against governor and secretary of state).

N.M.I. Const. art. VIII, § 3 assigns the legislature the duty to enact election procedures. The legislature has delegated much of its authority to a Board of Elections, and has given the Governor the power to appoint the members of that agency. 1 CMC § 6101 et seq. Enforcement of criminal penalties for violation of election laws is also an executive function. 1 CMC §§ 6341, 6501 et seq.

The majority notes that courts have permitted suits against governors to enjoin enforcement of unconstitutional apportionment, and from proclaiming, certifying or conducting any election. Majority opinion, *supra*, at note 41. Although Sablan does not specifically request this relief, his second amended complaint does ask for a "special election" and for "other and further relief as the Court deems just and proper." Even if the Governor's apportionment duties under the Covenant are construed as legislative action protected by legislative immunity, his enforcement authority regarding election matters provides an adequate basis to find that he is a proper party defendant. *Consumers Union*, 446 U.S. at 734-35, 100 S. Ct. at 1976, 64 L. Ed. 2d at 655-56 (action against Virginia Supreme Court sustained on its enforcement authority, even though its promulgation of rules

_____

acts of the judge in *Forrester*.

was termed legislative). Sablan has sufficiently[79] requested relief on a well-pleaded claim against the Governor to the effect that the CNMI Senate districts are unconstitutionally apportioned.

For these reasons, I would reverse the lower court's dismissal of the claims against the Governor because of his "legislative" immunity.

### "Person" under 42 U.S.C. § 1983

When acting in his official capacity, the Governor is a "person" subject to declaratory and injunctive relief under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).

Therefore, I would consider the merits of Sablan's claim that his equal protection rights have been violated by Covenant and CNMI Constitutional provisions requiring a Senate apportioned on the basis of geography rather than population.[80]

---

[79] Sablan's complaint references the Governor's duties regarding appointment of officials, but does not specifically mention his duties regarding elections. However, in a motion to dismiss, the complaint is read in a light most favorable to the appellant, as noted in the majority opinion. I would apply this rule of liberal construction in Sablan's favor.

[80] The majority discusses whether Sablan has also sufficiently pleaded a claim for violation of substantive due process or other constitutionally-protected rights directly under the U.S. Constitution. *Cf. Bivens v. Six Un-Named Agents*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) (permitting direct constitutional claim against federal agents). Voting rights have a substantive aspect that is protected by the U.S. Constitution. Because I would reverse on the 42 U.S.C. § 1983 claim, however, I do not reach the issue of whether Sablan would also succeed on a direct claim under the U.S. Constitution. I only observe that due process protections under the Fifth Amendment are generally considered to apply in unincorporated territories *ex proprio vigore*. *Colon-Rosich v. Puerto Rico*, 256 F.2d 393 (1st Cir. 1958); *Mora v. Mejias*, 206 F.2d 377 (1st Cir. 1953). I further note that consideration of a substantive due process claim concerning voting rights may necessarily involve evaluating a CNMI voter's access to the ballot in both houses, and that there is some concern as to whether even the CNMI House of Representatives is apportioned within population parameters. *See* Howard P. Willens & Deanne C. Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovations in a Pacific Setting* [hereinafter "Willens & Siemer"], 65 GEO. L.J. 1373, at 1414-23 (1977).

---

## III

## Apportionment: Background and History

The CNMI is a Micronesian island chain north of the equator in the western Pacific Ocean. The population is distributed among the three main islands of Saipan, Rota and Tinian, with a few people residing on some of the other islands (referred to collectively as the "Northern Islands") .

The Northern Mariana Islands (NMI) were formerly part of the Trust Territory of the Pacific Islands (TTPI), administered by the U.S. under a Trusteeship Agreement with the United Nations.[81] The NMI had previously been administered or ruled successively by Spain[82] (for approximately 400 years), Germany and Japan (both in the 20th century). The Trusteeship Agreement established a temporary administration during which the U.S. was to help the islands advance politically, economically and socially, and to work toward self-determination. During the U.S. administration, TTPI inhabitants participated in self-government through evolving systems. The Mariana Islands Legislature was, for some time, a unicameral legislature; the Congress of Micronesia was a bicameral legislature. During the TTPI administration, legislative districts with representation apportioned by population were introduced to the people of Micronesia.

The U.S. was obligated to assist Micronesians to achieve freely-expressed political self-determination. To meet that obligation, the U.S. began discussions with TTPI representatives about the possibility of a future relationship. In 1969 status negotiations, the NMI expressed a strong desire to "immediately unite (or 're integrate') with the United States Territory of Guam," motivated by "ethnic kinship with residents of Guam and . . . ties of language, religion, culture and blood."[83] When this proved unfeasible, the NMI negotiated for separate status, culminating in the execution of the Covenant. On June 17, 1975, NMI voters approved the Covenant in a plebiscite with a favorable vote of 78.8%; 55% was needed for passage.[84] On March 24, 1976, the

---

[81] Trusteeship Agreement for the Former Japanese Mandated Islands (1947), *reprinted in* CMC at A-201 et seq.

[82] Spain ruled all of the Mariana Islands, including Guam.

[83] Report of the Future Political Status Commission, Congress of Micronesia, at 33-34 (1969).

[84] *See* Secretarial Order No. 2973 (Apr. 10, 1973), issued by Secretary of the Interior Rogers C.B. Morton.

U.S. Congress enacted the Covenant as P.L. 94-241.[85]

The population of the main islands of the NMI at the inception of the Commonwealth was approximately 14,332, distributed as follows: Saipan, 12,514, Rota, 1,104, and Tinian, 714. *See* Howard P. Willens & Deanne C. Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovations in a Pacific Setting* [hereinafter "Willens & Siemer"], 65 GEO. L.J. 1373, 1416, n. 174 (1977) (citing figures based on 1973 census and 28th annual State Department report on the TTPI).

The 1990 Census[86] reported the CNMI's population at 43,345, distributed as follows: Saipan, 38,896, Rota, 2,295, and Tinian, 2,118. The Northern Islands were reported as having 36 people. These citizens reside and vote in the Saipan Senatorial District.

Covenant § 203(c) requires that one house of the CNMI's bicameral legislature be apportioned on a geographic basis, with each of the three "chartered municipalities"[87] having equal numbers of representatives. Thus, in the nine-member CNMI Senate each island senatorial district is apportioned three Senators. N.M.I. Const. art. II, § 2(a).

The framers of the Covenant and CNMI Constitution knew that apportionment based on geography rather than population was at variance with the U.S. Supreme Court ruling in *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964).[88] *Reynolds* held that both houses in a state legislature must be apportioned on a population basis to comport with the Fourteenth

Amendment's equal protection guarantee.[89] To justify the departure from U.S. Constitutional voting rights standards, the framers created a legislative history explaining their reasoning.

In examining the challenge raised by Sablan,[90] the Court should scrutinize the reasons for this departure from constitutional standards, with reference to the *Insular Cases*.[91]

### Insular Cases

In the *Insular Cases*[92] the U.S. Supreme Court held that all constitutional rights guaranteed to inhabitants of the several states do not necessarily follow the flag into

---

[89] 377 U.S. at 568, 84 S. Ct. at 1385, 12 L. Ed. 2d at 531.

[90] To qualify to be a Senator, Sablan must be eligible to vote in the CNMI. N.M.I. Const. art. II, § 2(c). Thus he meets the test for standing specified in *Hillblom v. United States*, 3 CR 294 (D.N.M.I. 1988).

[91] There is some tension in the cases as to whether the Territorial Clause of the U.S. Constitution applies to the CNMI and whether analysis under the *Insular Cases*, which is based on the Territorial Clause, is warranted. As I view it, the basis for the U.S. Congresses' authority to negotiate the Covenant with the CNMI is the express authority granted in the Territorial Clause, along with its power to enter into international agreements.

I consider the CNMI a U.S. territory in the sense that it is a geographic and political area under U.S. sovereignty. In the inception of the Covenant, the U.S. was required to exercise its territorial power and must have complied with the *Insular Cases*.

The Covenant is not a treaty. If it were, U.S. Senate ratification by a two-thirds majority would have been required, and no House action would have been necessary. U.S. Const. art. II, § 2, cl. 2. The Covenant did not obtain the required U.S. Senate approval under the treaty power of the U.S.

When the people of the Commonwealth voted for the Covenant, they engaged in a declaration of self-determination; when the U.S. Congress enacted P.L. 94-241, they exercised the Territorial Clause power under the U.S. Constitution.

However, once the Covenant became effective, U.S. authority in the CNMI became limited by the Covenant and is not now co-extensive with the plenary power of the Territorial Clause. *See, e.g., United States ex rel. Richards v. DeLeon Guerrero*, 4 F.3d 749, 754 (9th Cir. 1993).

[92] *Downes v. Bidwell*, 182 U.S. 244, 21 S. Ct. 770, 45 L. Ed. 1088 (1901); *Hawaii v. Mankichi*, 190 U.S. 197, 23 S. Ct. 787, 47 L. Ed. 1016 (1903); *Dorr v. United States*, 195 U.S. 138, 24 S. Ct. 808, 49 L. Ed. 128 (1904); *Balzac v. Porto Rico*, 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627 (1922).

---

[85] Prior court decisions have set out the salient details of this history. *See Wabol v. Villacrusis*, 958 F.2d 1450, 1458-59 (9th Cir.), *cert. denied sub nom.*, *Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 675, 121 L. Ed. 2d 598 (1992); *Commonwealth of the N. Mariana Islands v. Atalig*, 723 F.2d 682 (9th Cir.), *cert. denied*, 467 U.S. 1244, 104 S. Ct. 3518, 82 L. Ed. 2d 826 (1984); *Hillblom v. United States*, 896 F.2d 426 (9th Cir. 1990).

[86] It is appropriate for the court to take judicial notice of census records. *City of Port Arthur, Texas v. United States*, 517 F. Supp. 987, 992 n.5 (D.C.D.C. 1981), *aff'd*, 459 U.S. 159, 103 S. Ct. 530, 74 L. Ed. 2d 334 (1982).

[87] The chartered municipalities were the islands of Saipan, Rota and Tinian.

[88] *See* Hearings on Marianas Political Status Before the Subcommittee on Territorial and Insular Affairs of the House Committee on Interior and Insular Affairs, 94th Cong., 1st Sess., at 98-99 (1975) ("We . . . forewarned them that such a provision might be successfully challenged in the courts on the basis that it violated the one-man-one-vote principle").

unincorporated territories.[93] As a corollary to this principle, the Court also held that Congress is constitutionally prohibited from denying fundamental and personal rights in territories. "'Doubtless Congress, in legislating for the territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments . . . .'" *Dorr v. United States*, 195 U.S. 138, 146, 24 S. Ct. 808, 812, 49 L. Ed. 128 (1904) (quoting *Church of Jesus Christ of Latter Day Saints v. United States*, 136 U.S. 1, 10 S. Ct. 792, 34 L. Ed. 481 (1889)).

To paraphrase and apply the analysis of the court in *Wabol*, 958 F.2d at 1459, the threshold inquiry is whether Congress could, under the Territorial Clause of the U.S. Constitution, properly exclude application of the Equal Protection Clause as applied in *Reynolds* to voting rights in the CNMI. Put another way, did Congress exceed its powers under U.S. Const. art. IV, § 3 by insulating Covenant § 203(c) from the reach of the Equal Protection Clause?[94]

This is a question regarding constitutional limits upon the authority of the U.S. Congress, not about decisions made by the framers of the Covenant.[95]

---

[93] An unincorporated territory is, for example, one not destined för statehood. *Dorr, supra*; *Atalig*, 723 F.2d at 688. It is clear that the CNMI is unincorporated. *Wabol*, 958 F.2d at 1459, n.18.

[94] As noted in *Wabol*, 958 F.2d at 1459, "[i]t appears that in approving the Covenant and the Commonwealth Constitution, the federal government was potentially constrained by both the Trusteeship Agreement and the United States Constitution." The Trusteeship Agreement specifically provided that the U.S. had to "protect the rights and fundamental freedoms of all elements of the population without discrimination." Since Sablan did not raise this claim, it may be inappropriate to consider. However, the Trusteeship Agreement sheds light on what rights are considered fundamental in the international sense, for purposes of *Insular Cases* analysis. *See* discussion *infra*.

[95] The amicus argued forcefully before this Court that a decision invalidating Covenant § 203(c) would "have taken the expectations and the hopes and the wishes of the people that were exercising their right of self-determination for the first time in history and . . . say . . . 'You made it wrong.'" Transcript of oral argument at 65 (July 6, 1995). However, the issue is not about the actions of Covenant negotiators or voters. The issue is the scope and extent of U.S. Congressional authority. The Covenant negotiators clearly understood that the U.S. Congress might not have the authority to waive application of the Fourteenth Amendment to voting rights. They took a risk, a gamble; their willingness to take this risk does not bind the Court to interpret the U.S. Constitution according to their desires.

The *Insular Cases* provide a two-step analytical framework for determining whether a constitutionally-protected right applies of its own force in an unincorporated territory. First, is the right fundamental in the international sense? Second, would application of the right be impractical and anomalous in the territory? This two-step analysis is designed to further both the protection of fundamental rights and Congresses' ability to form political alliances. *Wabol*, 958 F.2d at 1461.

The two steps in this analysis are interrelated and not discrete; the test requires some balancing.

> Thus, the unincorporated territory doctrine of the *Insular Cases*, as interpreted in *Reid*,[96] emphasizes that the determination whether a particular constitutional provision applies to an unincorporated territory depends on the degree to which the provision is deemed to be fundamental and whether the provision is consistent with the needs, customs, traditions, culture, and institutions of the territory. When a more basic or fundamental guarantee of personal liberty is at issue, the doctrine of the *Insular Cases* requires a greater inconsistency before the constitutional provision is found to be inapplicable than when a less fundamental constitutional guarantee is at issue.

Willens & Siemer, 65 GEO. L.J. at 1396 (footnote added).

The burden of proof should be on the government, arguing in favor of the limitation.

> An appropriate judicial standard would undoubtedly begin with the presumption that the United States Constitution should be fully applicable in any territory under the sovereignty of the United States. The burden of proof with respect to any proposed exception from the United States Constitution should be allocated to that party claiming that special circumstances in a particular territory justify such an exception.

*Id.* at 1398.

### A Fundamental Right in the International Sense

The question of what constitutes a fundamental right in the international sense is not easily resolved.

---

[96] *Reid v. Covert*, 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957).

The "fundamental" constitutional rights identified as applying of their own force in the unincorporated territories included certain aspects of due process and, apparently, the right to just compensation. Although the cases intimated that the broad spectrum of basic natural or personal rights—such as freedom of speech and the press, free access to courts of justice, entitlement to due process of law and to equal protection of the laws, and "such other immunities as are indispensable to a free government"—might also fall within the class of "fundamental" rights applicable to the unincorporated territories, that question remained unanswered because the cases focused principally upon constitutional protections deemed not to apply *ex proprio vigore* to the unincorporated territories. Thus, for all that has been written, the incorporation doctrine and the resolution of the subsidiary question of what constitutional provisions apply to unincorporated territories remain confused and ambiguous.

*Id.* at 1394-95 (citations omitted).

There are no cases determining the exact issue before us. There is scant indication elsewhere[97] and none that is binding or authoritative.

The strong language of *Reynolds* indicates that the U.S. Supreme Court considers equal protection at the ballot box a fundamental right.

> Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long

---

[97] See legislative history of P.L. 89-552, at U.S.C.C.A.N. vol. 2, 89th Cong., 2d Sess., Report of the Secretary of the Interior to House Committee on Interior and Insular Affairs (Mar. 28, 1966), in which the Secretary, in support of legislation for redistricting in Guam and application of the "one person, one vote" principle, stated: "It is our view that the 'one man, one vote' rule enunciated by the Supreme Court, which rule is not now applicable in the territories, should, in the future, be a measure of the propriety of territorial apportionment."

Similarly, see legislative history of P.L. 89-548, at U.S.C.C.A.N. vol. 2, 89th Cong., 2d Sess., Report of the Secretary of the Interior to Speaker of the House (Mar. 3, 1966), in which the Secretary supports legislation for application of the "one person, one vote" principle to the Virgin Islands.

These records imply that the "one person, one vote" principle is not automatically extended to the territories; there is, however, no discussion or explanation of this view.

as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system.

*Reynolds*, 377 U.S. at 562, 84 S. Ct. at 1382, 12 L. Ed. 2d at 527.

> [T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of the place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race . . . or economic status . . . . And the democratic ideals of equality and majority rule, which have served this nation so well in the past, are hardly of any less significance for the present and the future.

*Id.*, 377 U.S. at 566, 84 S. Ct. at 1384, 12 L. Ed. 2d at 529-30 (citations omitted).

The right to vote in a fair and unimpeded manner, and to have that vote count equally with others, is essential to a republican form of government. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535, 11 L. Ed. 2d 481, 492 (1964). "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381, 83 S. Ct. 801, 809, 9 L. Ed. 2d 821, 830-31 (1963).

For the U.S. to claim sovereignty[98] over any people and deny some of them in their local governance an equal voice at the ballot box based on where they live is a gross distortion of the fundamental concept of government of the people, by the people, and for the people.[99] As noted

---

[98] Covenant § 101 places the CNMI under U.S. sovereignty.

[99] In *Dorr, supra*, the U.S. Supreme Court quoted from a source averring that "the people, except as Congress shall provide for, are not of right entitled to participate in political authority until the territory becomes a state." 195 U.S. at 148,

in *Reynolds*, this type of discrimination is as invidious as discrimination based on race.

Nor is discrimination acceptable in the international sense of fundamental freedoms. Article 6, section 3 of the Trusteeship Agreement required the U.S. to "protect the rights and fundamental freedoms of all elements of the population without discrimination." The United Nations Charter, at Chapter XII, Article 76, sets as basic objectives of the trusteeship system the encouragement of "respect for human rights and for fundamental freedoms for all without discrimination as to race, sex, language, or religion."

Both Governor Tenorio and Sablan acknowledge that the Universal Declaration of Human Rights[100] and the International Covenant on Civil and Political Rights[101] set a standard of "universal and equal suffrage." Appellee's Brief at 36; Appellant's Brief at 43-45.

The International Covenant provides that the U.S., as a party,

> undertakes "to respect and to ensure" to all individuals within its territory and under its jurisdiction the rights recognized in the [International] Covenant "without distinction of any kind such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status"; to adopt legislative or other measures necessary to give effect to these rights and to provide an effective remedy to those whose rights are violated.
>
> The rights enumerated in the Covenant include: self-determination, right to life; right to liberty and security of person . . . right to vote and participate in public affairs; and equal protection of the law.

U.S. Senate Executive Report 102-23, 102d Cong., 2d Sess. § V(1) (1992).[102]

---

24 S. Ct. at 812, 49 L. Ed. 128. This suggests that Congress could, under the Territorial Clause, refuse the vote altogether. However, the issue presented by this case is whether, in exercising its territorial powers, Congress can permit the vote in a discriminatory manner.

[100] Adopted by the United Nations General Assembly in 1948.

[101] The U.S. is also a party to this International Covenant, an agreement which implements the Universal Declaration of Human Rights.

[102] Excerpts included at addenda to Appellee's Brief; see also history of enactment and ratification therein.

This body of international authorities lends strong support to the conclusion that equality in voting rights is a fundamental right in the international sense under *Insular Cases* analysis.

The lower court determined that the "one person, one vote" principle was not a fundamental right in the international sense because the U.S. Senate is not apportioned on that basis but is nonetheless part of a fundamentally fair republican form of government. It is also common in international law for international bodies to base voting rights on national status and not on the populations of the member nations.[103]

I do not find this analysis persuasive. Laws governing sovereign entities cannot be compared to the rights of individuals to participate in local governance.[104] If a fundamental right means anything, it certainly means the right to nondiscriminatory participation in local government. In exercising its authority under the Territorial Clause, the U.S. Congress cannot favor some citizens over others in local governance by allowing them a more powerful voice at the ballot box.[105]

The lower court's comparison of the NMI's efforts to express self-determination with those of the U.S. in its founding is also flawed. I question whether the different islands of the NMI possessed sovereignty independently of each other. Each island was already a part of the Marianas District of the TTPI. They were governmental units (i.e., "chartered municipalities"), not sovereign entities.[106] And while they were engaged in the important task of self-determination, they did not form a new nation but instead joined the U.S. political family.

There are other important distinctions as well. The U.S. was founded with thirteen original colonies as states and the possibility of countless more being added. The possible combinations among the representatives in forming coalitions were numerous, and the likelihood of

---

[103] Georg Shwarzenberger, A MANUAL OF INTERNATIONAL LAW 64 (5th ed. 1967) (referring to "sovereign equality" in the United Nations Charter).

[104] The CNMI Legislature is vested with power over all rightful subjects of legislation, but this is constrained to "local self-government." Covenant §§ 103, 203(c).

[105] Such favoritism to one or two segments of the population over others would also be in derogation of the U.S.'s Trust Agreement obligation to "protect the rights and fundamental freedoms of all elements of the population without discrimination."

[106] Compare to the history of the founding of the U.S. as set forth in *Wesberry v. Sanders*, 376 U.S. 1, 9-17, 84 S. Ct. 526, 530-535, 11 L. Ed. 2d 481, 487-92 (1964).

the majority will being denied was small. In contrast, the Covenant establishes only three Senatorial districts.[107] The likelihood of the majority of the population on Saipan being thwarted by the minority on Rota and Tinian is virtually assured.

> If such a scheme were permissible, an individual citizen's ability to exercise an effective voice in the only instrument of state government directly representative of the people might be almost as effectively thwarted as if neither house were apportioned on a population basis. Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis . . . .

*Reynolds,* 377 U.S. at 576, 84 S. Ct. at 1389, 12 L. Ed. 2d at 535.

In my view, when the U.S. Congress agreed to Commonwealth status for the NMI, it had to provide for the international fundamental right of nondiscrimination in voting, and was thus compelled to apply the Fourteenth Amendment's "one person, one vote" principle, absent some very strong showing that to do so would be "impractical or anomalous."

### Impractical or Anomalous?

In determining whether it was impractical or anomalous to apply the "one person, one vote" principle in the Commonwealth, we must consider the political experience of the people of the NMI. Prior to the inception of the Commonwealth, they had already been exposed to apportionment based on population and geographical districts in their experience with the Congress of Micronesia. During the birth of the CNMI, they showed a keen understanding of and aptitude for self-governance, evidenced by their adoption of a republican form of government, with voting and representatives and taxes and a constitution; they demonstrated flexibility and sophistication. They chose to have a Governor although they had no prior experience with this office.[108] It can

certainly be said that the people of the NMI were adept in grasping the principles of democracy.

The presumption favoring full application of the U.S. Constitution in a territory[109] is buttressed by the experience and capacity of the people of the NMI to have proportional representation in election districts.

Governor Tenorio submits that the freedom of each island to negotiate separately with the U.S. or foreign countries[110] and the unwillingness of Rota and Tinian residents to accede to a union with Saipan unless they had extra voting power are practical considerations outweighing potential application of the "one person, one vote" principle. In other words, for the U.S. Congress to secure the union of the NMI under the Covenant, it had to forego applying this fundamental right.

Political and cultural considerations were certainly compelling in judicial analysis of the land alienation restriction when its constitutionality was challenged. *See Wabol, supra* (examined in greater detail *infra*). However, that restriction applies in favor of all of the indigenous population of the NMI; it is reasonable to assume that most NMI residents supported the restriction and would have withheld their approval of the Covenant without it. In contrast, the Covenant provision mandating greater voting power for Rota and Tinian favored only 1,818 people out of 14,332. The effect of noninclusion of this provision in the Covenant is mere conjecture.[111]

---

[107] There is also provision for a fourth senatorial district to be established for the Northern Islands should their population reach 1,000. It is presently at 36. The maximum number of districts is four.

[108] *See* Willens & Siemer, 65 GEO. L.J. at 1427.

---

[109] *Id.,* 65 GEO. L.J. at 1398, quoted *supra.*

[110] Nowhere is this "right" established. Even the authority of the NMI to negotiate separately from the rest of the TTPI was questioned. *See* Cong. of Micronesia Sen. Joint Res. No. 38 (1973) and Cong. of Micronesia Sen. Report No. 62 (1973); *cf.* Mariana Islands Dist. Legis. Res. No. 1973 (1973) (passed in reaction to these concerns, this resolution asserts such authority based on a letter from President Nixon to U.S. negotiator Franklin Haydn Williams directing him to negotiate with the "Mariana Islands"; the letter does not indicate that there would or could be negotiations with any separate island).

[111] The Covenant needed only 55% of the vote in order to be accepted in the plebiscite election. It garnered 78.8%, with 93% of the electorate voting. The populations of Rota and Tinian comprised approximately 12.8% of the total NMI population. The Covenant was accepted by a substantial margin, greater than the percentage of NMI population in Rota and Tinian. Furthermore, the desire to have close ties with the U.S. was predominant for many years. *See, e.g.,* Don A. Farrell, HISTORY OF THE NORTHERN MARIANA ISLANDS 497-98, 537 (Phyllis Koontz ed., 1991) (people of the Northern Mariana Islands expressed their desire for U.S. citizenship in 1950 to visiting United Nations mission and in 1961 poll).

Much emphasis is laid on the cultural and historical differences between Saipan and Rota and Tinian. This is used to explain why Rota and Tinian demanded disproportionate representation[112] in the Senate and why application of the "one person, one vote" principle would be impractical and anomalous in the Commonwealth. However, the reasons for an exception to application of the U.S. Constitution in a territory must be based on fact, not opinion or other unsubstantiated conjecture. *Wabol*, 958 F.2d at 1461.

There were obviously variations in the histories of each of the islands of the Marianas. *See* Don A. Farrell, HISTORY OF THE NORTHERN MARIANA ISLANDS [hereinafter "Farrell"] 285, 505, 531, 537 (Phyllis Koontz ed., 1991). However, this divergence did not necessarily divide the people. Even among delegates to the 1976 CNMI Constitutional Convention, these asserted differences between the islands were not apparent. Delegate Olympio T. Borja said: "I have seen a lot of references in the news media about so-called 'geographical differences' at this Convention. For myself, however, I wonder just what geographic differences are being referred to?" 1 *Journal of the Northern Mariana Islands Constitutional Convention* 88 (1976).

Examination of historical materials confirms that at the time of the adoption of the Covenant and CNMI Constitution, most of the people on Saipan, Tinian and Rota spoke the same language (Chamorro),[113] shared a common cuisine, practiced (predominantly) the Catholic faith, and had the same island culture.[114] It is, in fact, not unusual for members of the same family to live on different islands. *Cf.* Farrell, *supra*, 532-33.

In 1969, a few years prior to the commencement of Covenant negotiations, the people of the NMI expressed their desire to seek political union with Guam, claiming

extensive ties of culture, religion and kinship.[115] This desire was first expressed as early as 1950 in a petition from the Rota Council to the United Nations visiting mission. *Id.* at 34. It had been a consistent goal for many people of the NMI until rejected by the people of Guam. *Id.* at 532-44. Even after rejection by Guamanians, more Northern Mariana islanders voted for reunification with Guam than for any other choice of status.

The Covenant negotiators tried to rationalize extra voting power for Rota and Tinian by maintaining that the people of these islands were so different from the Saipanese that they would back out of a union without concessions. The historical variations of Rota were apparently extended to cover Tinian in this rationalization. The strongly-expressed wishes of the islanders for twenty-five years to be reunited with Guam due to ethnic and cultural ties were completely ignored. The historical record does not support the categorical statement that intense dissimilarities made voting discrimination necessary. Although the Covenant negotiating history does contain conclusory statements that this concession was necessary to appease Rota and Tinian and complete the Covenant negotiations, the entire historical record does not support the claim that the union was doomed to failure without waiver of the "one person, one vote" principle.[116] The exception to population-based apportionment was not proposed or insisted upon until the last round of Covenant negotiations, in January 1975.[117] This fact further casts doubt on the essential nature of Covenant § 203(c) to the conclusion of the negotiations.

What fueled the debate over CNMI Senate apportionment was the desire of a smaller community to have more say and greater power.[118] Is this enough to warrant

---

[112] This is usually phrased as "equal representation" for the islands, but it is equal for the geographic or political entity of each island and not equal for the people.

[113] *Cf.* House Report No. 94-364, 94th Cong., 2d Sess., on Covenant § 203(c) (use of Chamorro language could be required for employment through exercise of legislature's authority under this provision).

[114] The only significant minority was and is on Saipan and consists of Carolinians, islanders who have ancestors from the Caroline Islands. The real cultural distinction is between the minority on Saipan and the rest of the NMI population of Chamorros. CNMI Archives document 034127, E.E. Archer, Transcript of working session of negotiations at 6 (Feb. 11, 1975) (copy attached as Exhibit 9 to Brief of Amicus Curiae).

[115] Congress of Micronesia, *Report of the Future Political Status Commission* at 33-34 (1969).

[116] *See also* CNMI Archives document 034117, Transcript of working session of negotiations at 6 (Feb. 8, 1975) (questioning whether Guam and the Northern Marianas could be integrated at the request of Guam, and noting that it would be more convenient administratively) (copy attached as Exhibit 8 to Brief of Amicus Curiae).

[117] Eleventh Rota Mun. Council, 1st Reg, Sess., Res. No. 11 MC-27-1975 (Jan. 20, 1975) (copy attached as Exhibit 6 to Brief of Amicus Curiae).

[118] The concern felt by the people of Rota stems from both a disenchantment with the past and a guarded optimism about the future. Under the present Trust Territory administration, Rotanese have consistently been treated as the poor cousins of our Saipan neigh-

the U.S. Congresses' departure from fundamental rights for U.S. citizens in the Commonwealth? In light of the importance accorded the will of the people both in the U.S. and internationally, I think not.

> [T]o sanction minority control of state legislative bodies would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will.

*Reynolds*, 377 U.S. at 565, 84 S. Ct. at 1383, 12 L. Ed. 2d at 529.

Governor Tenorio maintains that Covenant § 203(c) was "narrowly tailored" to protect the minority rights of the people of Rota and Tinian.[119] This assertion is not supported by the historical record.

A draft version of Covenant § 203(c) provided for a unicameral legislature and stated that the "Constitution of the Northern Mariana Islands may provide for a distribution of the legislature's membership on the basis of appropriate considerations in addition to population."[120] Allowing for considerations other than population is consistent with *Reynolds*. Thus, the draft Covenant already provided some relief for Rota and Tinian's concerns. The Rota delegates who raised concerns and dissatisfaction with Saipan's power asked for a bicameral legislature. This alone would assist in having their voices heard.[121]

Acceding to the demand of the Rota and Tinian delegates for a Senate apportioned on geographic/political boundaries without regard to population may have been politically expedient and hastened the conclusion of lengthy and difficult negotiations. However, I cannot agree that applying nondiscriminatory voting rights in the CNMI would therefore be impractical or anomalous.[122]

The lower court's analysis of why application of the "one person, one vote" principle would be impractical and anomalous in the CNMI hinges upon the conjecture that the Covenant would not have been concluded unless an express exception to it was provided. I reject this proposition for the reasons stated above.

More importantly, the lower court seemed reluctant to embark on the task of reapportionment, should it find otherwise.[123] I can certainly understand this reluctance, but cannot sanction it. Cases coming before the courts are often "perplexing and complicated."[124] Judges must, however, carry out their duties, even though politically unpopular or unusually difficult.

---

bors. We have submitted budget requests which have been ignored, while the approved budget affecting Rota is controlled and administered by the District Administrator on Saipan. We have sought financial assistance from the District legislature for our Municipal Operating expenses and the response has been unsatisfactory. Unfortunately, these requests were made necessary by a combination of factors including the limitations placed on our municipal taxing powers under the Trust Territory Code. Recommendations made by our District Administrator's Representative and his department heads, our Municipal Council, and our Mayor have been consistently disregarded.

*Id.*

[119] Appellee's Brief at 31, 45, quoting Northern Marianas Constitutional Convention, *Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands* at 31 (1976).

[120] December 19, 1974, Draft of Covenant.

[121] *See Reynolds*, 377 U.S. at 576-577, 84 S. Ct. at 1389, 12 L. Ed. 2d at 535-36 (discussion of benefits of bicameralism, despite requirement that both houses be apportioned primarily on basis of population).

[122] I reach this conclusion based on my review of the historical record. Sablan urges that the historical record is in error and contains disputed facts that the lower court erroneously resolved in favor of the defendants. This resolution of disputed facts on summary judgment warrants reversal. Thus, I disagree with the majority opinion at section III, *supra*.

However, in my view, even assuming that the historical record of facts truly reflects the situation, there is insufficient basis for finding that application of non-discriminatory voting districts would be impractical or anomalous.

[123] "[C]hanging the structure of the Senate by judicial order would indeed be 'impractical and anomalous.'" *Sablan v. Tenorio*, Civ. No. 94-0500 (N.M.I. Super. Ct. July 18, 1994) (Memorandum Decision on Motions to Dismiss and Judgment at 32).

[124] *Baker*, 369 U.S. at 245, 82 S. Ct. at 725, 7 L. Ed. 2d at 702 (Douglas, J., concurring).

## Insular Cases Analysis: Conclusion

There are two provisions in the Covenant[125] and another in the CNMI Constitution[126] that specifically provide for exceptions from U.S. Constitutional protections. The Ninth Circuit Court of Appeals has twice visited the Covenant or CNMI Constitution to ascertain whether challenged exceptions violate U.S. Constitutional equal protection guarantees, and has upheld the exceptions.[127] This case challenges the unresolved exception.

In the two cases decided, the arguments for divergence from application of the U.S. Constitution as in the several states was much stronger than in this case. In *Atalig, supra*, the issue was whether the denial of a jury trial in certain criminal cases offended due process. The *Atalig* court could cite prior pronouncements of the U.S. Supreme Court[128] in concluding that grand jury indictment and jury trials are procedural protections and not always accorded the status of fundamental rights. With substantial precedent, the *Atalig* court was on firm ground in ruling that deviation from the U.S. Constitution in judicial procedures was permissible.

In *Wabol, supra*, the issue was whether a restriction on ownership of land in the Commonwealth to those of NMI descent was permissible. The *Wabol* court explored new ground, but could easily see that land is scarce in the Commonwealth and has a cultural value very different from that held in the wide expanse of the United States. The court was also guided by the Trusteeship Agreement, which required the U.S. to protect the inhabitants of the Commonwealth "against the loss of their lands." The court upheld the exception to the U.S. Constitutional equal protection standard because "interposing this constitutional provision would be both impractical and anomalous" regarding their land. *Wabol*, 958 F.2d at 1462.

This case presents the most difficult issue, an exception to the Fourteenth Amendment's protection from discrimination in voting. There is no precedent for waiver of the "one person, one vote" principle involved.

I conclude that because the right to nondiscriminatory voting is a fundamental right, even in the international sense, the reasons for variance from the "one person, one vote" principle given here do not outweigh the presumption in favor of applying the right. In short, applying the "one person, one vote" principle in the CNMI is not impractical or anomalous.

Therefore, under *Insular Cases* analysis, I would rule that the U.S. Constitution's Fourteenth Amendment protection of voting rights has "followed the flag" into the CNMI.

## Apportionment: Violation of Equal Protection

The apportionment of the Senate is based strictly on geography, coinciding with political units of the CNMI government. The Saipan Senatorial District, comprising Saipan and the Northern Islands, has three Senators; the Tinian Senatorial District, comprising Tinian and the uninhabited island of Aguiguan, has three Senators; and the Rota Senatorial District, comprising Rota, has three Senators. The effect of this apportionment scheme is noted in the appendix to this dissent.

There was no attempt or good faith effort[129] in the Covenant or CNMI Constitution to apportion the Senate based on population. Although the Fourteenth Amendment does not require the same precision of mathematical equality in apportionment as does U.S. Const. art. I, § 2 for the U.S. Congress,[130] and while some other state interests, such as preserving political units and having compact districts, may be considered,[131] the primary criterion for constitutional apportionment must be population.[132] As stated in *Abate v. Mundt*, 403 U.S. 182 at 185-86, 91 S. Ct. 1904 at 1907, 29 L. Ed. 2d 399 at

---

[125] Covenant §§ 203(c) (malapportioned Senate) and 805 (land alienation restriction).

[126] N.M.I. Const. art. I, § 8 (giving the legislature authority to provide for jury trials, which it did inconsistently with the U.S. Constitution).

[127] *Atalig, supra; Wabol, supra*.

[128] *Dorr, supra; see also Government of Virgin Islands v. Bodle*, 427 F.2d 532 (3d Cir. 1970).

[129] *See Karcher v. Daggett*, 462 U.S. 725, 103 S. Ct. 2653, 77 L. Ed. 2d 133 (1983) (establishing two-prong test for federal congressional apportionment cases: [1] good faith effort to reduce or eliminate population differences and [2] legitimate state goal to explain all significant variations from equality).

[130] *See Mahon v. Howell*, 410 U.S. 315, 93 S. Ct. 979, 35 L. Ed. 2d 320. *modified*, 411 U.S. 922. 93 S. Ct. 1475, 36 L. Ed. 2d 316 (1973).

[131] *Reynolds*, 377 U.S. at 577, 84 S. Ct. at 1390, 12 L. Ed. 2d at 536.

[132] *Id.*, 377 U.S. at 579, 84 S. Ct. at 1390, 12 L. Ed. 2d at 537 (the overriding objective in reapportionment must be "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State").

403 (1971), the Supreme Court has "never suggested that certain geographic areas or political interests are entitled to disproportionate representation."

> Accordingly, we have underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests or which necessarily will tend to favor, for example[,] less populous districts over their more highly populated neighbors, see *Hadley v. Junior College District*, 397 U.S. 50, 57-58, 25 L. Ed. 2d 45, 51 90 S. Ct. 791 (1970).

*Id.*

Covenant § 203(c) does not provide for equal or nearly equal voting rights among CNMI citizens.[133] It violates the Fourteenth Amendment's equal protection-based "one person, one vote" principle.

The fact that the voters approved the Covenant, including Covenant § 203(c), does not immunize it from constitutional challenge. Voter approval of a state constitutional amendment for an apportionment plan inconsistent with the "one person, one vote" principle did not prevent the U.S. Supreme Court from ruling it unconstitutional in *Lucas v. Forty-Fourth Gen. Assembly of Colorado*, 377 U.S. 713, 84 S. Ct. 1459, 12 L. Ed. 2d 632 (1964). In *Lucas*, the Supreme Court quoted with approval the following: "One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections," *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185, 87 L. Ed. 628 (1943), and "[n]o plebiscite can legalize an unjust discrimination," *Hall v. St. Helena Parish Sch. Bd.*, 197 F. Supp. 649, 659 (E.D. La. 1961), *aff'd*, 368 U.S. 515, 82 S. Ct. 529, 7 L. Ed. 2d 521 (1962). *Lucas*, 377 U.S. 736 & n.29, 84 S. Ct.1474 & n.29, 12 L. Ed. 2d 647 & n.29.

Sablan's request for relief can be realistically addressed in only one of two places: the CNMI courts or the federal courts. He has no effective political solution.[134]

Because the challenged provision is part of Covenant Article II, any amendment is premised on mutual consent of the CNMI and the U.S.[135] Even if the governments of the U.S. and the Commonwealth undertook revision of Covenant Article II, the present Senate, in which Senators from Rota and Tinian have six of the nine votes, would likely block approval of a revision basing apportionment on population.

N.M.I. Const. art. XVIII provides for legislative or popular initiatives to amend the Constitution. However, the mechanics of these options leave little hope for a political change in apportionment. A popular initiative petition must be "signed by at least fifty percent of the persons qualified to vote in the Commonwealth and at least twenty-five percent of the persons qualified to vote in each senatorial district." N.M.I. Const. art. XVIII, § 4(a). It then goes to the legislature, where it must get a majority vote,[136] and then to the people. *Id.* A legislative initiative must start with a three-fourths majority vote in each house before being placed on a ballot for the people to consider. N.M.I. Const. art. XVIII, § 3.

These provisions effectively preserve Rota and Tinian's disproportionate political power, regardless of what population changes or other political shifts may occur. This inflexibility is out of character with the democratic principles of our government and the living nature of our constitutional foundation.

Finally, while the challenge to the apportionment scheme of the CNMI Senate strikes at one of the "fundamental provisions of the Covenant," I believe that the Covenant will not fall with the determination that this provision is impermissible. The Covenant itself provides that cases and controversies arising under the Covenant are justiciable. Covenant § 903. The challenge to the apportionment plan was anticipated in the negotiations and agreement on the Covenant and so the possibility of this section being stricken was also part of the bargain. The need to hammer out specific new language for Senate apportionment can be managed within the existing framework of Section 902, designated by the Covenant for U.S.-CNMI consultations.

---

[133] See appendix for chart of deviations.

[134] *Compare Davis v. Mann*, 377 U.S. 678, 689, 84 S. Ct. 1441, 1447, 12 L. Ed. 2d 609, 616 (1964) (noting absence of political remedy in apportionment dispute) *with Lucas*, 377 U.S. at 736, 84 S. Ct. at 1473, 1474, 12 L. Ed. 2d at 647 (presence or absence of available political remedy is of no constitutional significance).

[135] *See* Covenant § 105 (providing that modification of Article II and certain other provisions requires mutual consent).

[136] Even assuming that one-fourth of the voters of Rota and Tinian would sign the petition, the Senators from Rota and Tinian could easily block this, having six of the nine votes in the Senate.

## IV

### Conclusion

For the foregoing reasons, I would reverse the lower court's ruling on Sablan's claim concerning denial of his equal protection-based voting rights due to malapportionment of the CNMI Senate. I would hold that the "one person, one vote" principle applies in the CNMI through *Insular Cases* analysis, and that Covenant § 203(c) and N.M.I. Const. art. II, § 2(a) violate the Fourteenth Amendment to the U.S. Constitution.

I would remand to the Superior Court, directing it to retain jurisdiction and to allow the Governor sufficient time before the next Senatorial election to fashion a constitutional apportionment plan through the correct political processes. Should the Governor fail to do so prior to a deadline set by the court, the court would then design and mandate an appropriate apportionment plan, based on CNMI Senate districts of as nearly equal numbers of the population as possible.

### APPENDIX[137]

| CNMI Senate Districts | 1975 | 1990 |
|---|---|---|
| Saipan & Northern Islands | 12,514 | 38,932 |
| Rota | 1,104 | 2,295 |
| Tinian & Aguiguan | 714 | 2,118 |
| Total Population | 14,332 | 43,345 |
| Mean | 4,777 | 14,448 |
| Largest District | 12,512 | 38,932 |
| Smallest District | 714 | 2,118 |
| Citizen Population Variance (largest district population divided by smallest district population) | 17.524 to 1 | 18.381 to 1 |
| Maximum Deviation Above Mean | 161.9% | 169.5% |
| Maximum Deviation Below Mean | 85.05% | 85.34% |
| Total Maximum Deviation | 246.95% | 254.84% |

[137] Form based on appendix to *Wells v. Rockefeller*, 394 U.S. 542, 89 S. Ct. 1234, 22 L. Ed. 2d 535 (1969).